**LEVINGE CORPORATION and Ronald Glenn Hilliard, Appellants,**

v.

**Patricia LEDEZMA, Juana Oviedo de Ledezma, and Enrique Ledezma Torres, Appellees.**

No. 01–87–00284–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 26, 1988.

Rehearing Denied June 30, 1988.

H. Lee Lewis, Griggs & Harrison, Houston, for appellants.

Dennis M. Beck, Browning & Beck, Richard D. West, Houston, for appellees.

Before JACK SMITH, HUGHES and COHEN, JJ.

## OPINION

JACK SMITH, Justice.

This is an appeal from a judgment awarding damages based on negligence under the Texas Survival Statute and Wrongful Death Act. After a non-jury trial, the court awarded damages for the death of Enrique Ledezma to his mother, father, the executrix of the deceased's estate, and the intervenor. The appellants limit their appeal to the award of $1,248,022 in damages.

The decedent was fatally injured on March 5, 1984 while working as a construction laborer. Appellant Hilliard was the driver of a truck leased by appellant Levinge that was used to deliver framed wood walls to a condominium construction site in Houston, Texas. Enrique, a 27–year-old Mexican national, and his co-worker, Weston Blair, had unloaded the flat bed truck at two different locations at the construction site. They were riding on the back of the truck to the third unloading location when Blair saw Hilliard grin through the truck's side view mirror, and then felt the truck suddenly accelerate. Blair, Enrique, and several of the walls fell off the truck. Forty minutes later, Enrique was pronounced dead of a fractured skull.

In point of error number one, the appellants assert that the court's finding that the decedent would have contributed $215,000 to his mother during her lifetime is so against the great weight and preponderance of the evidence as to be manifestly unjust. Appellants single out findings of fact and conclusions of law numbers 64, 65, 66, and 69. In findings 64, 65, and 66, the court found that Enrique had been the primary contributor to his family by his regular contributions to his mother and had expressed intentions to continue supporting the family. In finding number 69, the court found that, "[b]ased upon testimony and evidence of past earnings, future wage earning capacity and past pattern of contributions, the deceased would have contributed at least Two Hundred Fifteen Thousand and No/100 Dollars ($215,000.00) to his Mother during her lifetime."

Appellants attack the testimony of appellees' expert witness, Thomas R. DeGregori, a professor of economics at the University of Houston, who calculated a 15–year income stream for Enrique, which multiplied by 45% equals approximately $215,000. Appellants claim this finding has no legal or factual support in the evidence.

In determining the legal support of a finding, this Court must consider only the evidence and inferences that tend to support the finding, disregarding all evidence and inferences to the contrary. *King v. Bauer*, 688 S.W.2d 845, 846 (Tex.1985); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). The finding is upheld if there is any evidence of probative force to support it. *In re King's Estate*, 150 Tex. 662, 665, 244 S.W.2d 660, 661 (1951).

In reviewing questions of factual sufficiency, this Court must consider and weigh all the evidence, both that in support of and contrary to the challenged finding. The finding must be upheld unless it is found that the evidence is so weak or the finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Id.; M.J. Sheridan & Son Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 623 (Tex.App.—Houston [1st Dist.] 1987, no writ).

When ruling on legal and factual insufficiency of the evidence questions, the legal sufficiency issue should be addressed first. The record reflects that at the age of seven, Enrique began working to help support his family. He always gave a part or all of his earnings from his various jobs to his mother. When he worked for a fruit store, he brought home fruit. When he was 13 years old, he helped at a bakery and brought home bread for the family. As a houseboy at age 15, he gave his entire salary to his mother and on occasion, a roasted chicken. When he was working a beer delivery route, he was able to give his mother 20 to 25 pesos a week. At age 18, he sold snack foods to restaurants and bars on commission. This allowed him to contribute 2,000 pesos a week to his mother and to bring home groceries. From the United States, Enrique sent his mother $300 from his monthly earnings of $640, or about 45% of his income.

Enrique continued to go to school in addition to working. By the time he arrived in the United States in 1983, he was almost ready to graduate from a Mexican university with a degree that would allow him to get a white-collar job in Mexico. He came to the United States to earn $800 he needed to pay to take his last exams and to purchase a graduation ring.

Appellees' expert witness, DeGregori, an economics professor at the University of Houston, testified that with Enrique's educational level, he would be among the upper 20% of income earners in Mexico. DeGregori then took 5.77% of Mexico's 1977 gross national product and attributed that as the contribution of the upper 20% of Mexico's wage earners to the GNP. He then calculated a per capita amount and converted that into U.S. dollars at the "real exchange rate." The "real exchange rate" was obtained from a World Bank study called Purchasing Power Parity, which reflects what an income would buy in different countries. Through his calculations, Degregori computed the per capita loss of income for a worker in the upper 20% of Mexico's wage earners to be $10,979 at the "real exchange rate". Using this, he tabu-

lated the loss of income stream for the 31.35 years that he estimated Enrique would have worked had he lived.

DeGregori provided data that showed the life expectancy of a female in Mexico to be 69 years. Enrique's mother testified that her age at the time of trial was 55 years of age. From the income stream, the amount of lost income at the "real exchange rate" for 15 years was $494,070. 45% of this figure is $222,331.50, which is approximately the equivalent to the $215,000 awarded in issue number 69.

The above evidence is of sufficient probative force to support findings 64, 65, 66, and 69. Appellants' legal sufficiency complaint cannot be sustained.

In reviewing appellants' factual sufficiency claim, the evidence in support of the challenged finding is the same as for the legal sufficiency point. A review of the record for evidence contrary to the finding shows that in Mexico, there are no statistics published as to salaries of white-collar workers. Therefore, DeGregori relied on data compiled and published by international researchers about the economy of Mexico in general and extrapolated down from this to calculate the income stream of a single white-collar worker. DeGregori made the assumption that Enrique would belong to the group of workers comprising the top 20% of all income earners in Mexico. To arrive at the per capita income stream, DeGregori also had to make assumptions concerning the average family unit size of upper income Mexican households, future salary levels of a Mexican worker with a comparable degree, and future inflation and interest rates in the Mexican economy.

DeGregori acknowledged that he did not speak Spanish, had never lived in Mexico, was not an expert in the Mexican economy, and that he was relying on information from international publications and on information given him by a friend of his, Professor Dilmas James, who did not testify.

The appellants' expert witness, Dr. Ann DeRouffignac, a professor at the University of Saint Thomas in Houston, stated that her special field of concentration is the political and economic development of Mexico. She speaks Spanish, lived several years in Mexico, and is married to a Mexican national. DeRouffignac stated that reliance on international publications results in inaccurate assumptions and that a field study of the incomes of actual workers would be the best method of obtaining data in Mexico. She testified that the starting salary for a person with Enrique's educational background would be $150 to $250 per month. As to DeGregori's projection that Enrique would be earning the market equivalent of $29,000 U.S. dollars in 15 years, she stated that this was impossible and pointed out that even the Director of Public Education of Mexico did not earn as much. DeRouffignac stated that DeGregori's calculations of income for someone in the top 20% of Mexican wage earners was not realistic because this included the incomes of the three to five percent that are actually multi-millionaires and the richest people in Mexico. DeRouffignac also testified that even more important than a title and degree in determining a salary in Mexico, are your connections with wealthy persons, political parties, and owners of large enterprises. The only evidence of Enrique's connections of this type, was the testimony that Enrique worked as a houseboy in a rich household.

DeRouffignac stated that the "market exchange rate" was a more realistic way to express Enrique's total earnings than the "real exchange rate." She stated that Enrique's total earnings for 15 years, would not exceed $250,000 at the "market exchange rate."

In the present case, the trial judge as trier of fact was the sole judge of the credibility of the expert witnesses and of the weight to be given their testimony. *Rego v. Brannon*, 682 S.W.2d 677, 680 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

Weighing all of the evidence, both that in support of and contrary to the finding awarding $215,000 to Enrique's mother, it can not be said that the finding is so against the great weight and preponder-

ance of the evidence as to be manifestly erroneous or unjust.

Point of error number one is overruled.

Appellants' point of error two asserts that there was no legally or factually sufficient evidence to support the finding that Enrique endured conscious pain and suffering prior to his death. Their third point of error alleges that the award of $175,000 for conscious pain and suffering was against the great weight and preponderance of the evidence so as to be manifestly unjust.

■ Co-worker Blair was the first to see Enrique after they both fell off of the truck. He testified that he saw Enrique bouncing and jerking on the ground. Enrique's eyes were wide open, and he was coughing and gasping for air. Blair stated that blood was coming out of Enrique's mouth in a steady flow and that he was trying to spit it out. To Blair, it seemed that Enrique was trying to talk but could not and that Enrique was in a great deal of pain. While waiting for the ambulance, Enrique's open eyes turned a solid black color and then "a clearish glass." Blair stated, "I know he was still alive when they put him in the ambulance."

Appellant Hilliard testified that he saw Enrique on the ground and observed that his eyes and nose were bleeding. He stated that Enrique was groaning as if he were in a lot of pain. He stated that he saw other workers picking Enrique up and trying to put him on his feet.

Appellants base their no evidence point on the fact that there was no medical witness testimony at trial; however, the autopsy report notes the presence of partially digested blood in Enrique's gastrointestinal tract, and the medical examiner certified the time of death as 3:43 p.m. The employer's accident report states the time of injury to be 3:05 p.m. The Houston Police Department investigator's report notes that cardiopulmonary resuscitation was in progress at 3:29 p.m. when Enrique arrived at the emergency room. Enrique was pronounced dead on arrival at the hospital.

The above evidence is legally and factually sufficient to support the trial court's finding that Enrique endured conscious pain and suffering prior to his death.

Point of error two is overruled.

Appellants contend that $175,000 for pain and suffering incurred by Enrique is excessive and against the great weight and preponderance of the evidence because there is an absence of evidence as to the length of time that he could have been conscious, and that the glassy appearance of Enrique's eyes is a condition of shock and denies pain.

■ Damages for pain and suffering during unconsciousness are not allowable. *Canales v. Bank of California*, 316 S.W.2d 314, 318 (Tex.Civ.App.—Eastland 1958, writ ref'd n.r.e.) (quoting 25 C.J.S. *Damages* § 62 (1966)). However, an award of $10,000 to a mother for her son's pain and suffering during five seconds of electrocution has been upheld by a Texas court. *Gulf States Utilities Co. v. Reed*, 659 S.W.2d 849, 855 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.).

■ In the present case, there was evidence that Enrique was unsuccessfully attempting to spit out the blood flowing from his mouth, unsuccessfully trying to talk, and had his eyes wide open at the same time that he appeared to be in a great deal of pain. Even though this condition may only have been observed for a short period of time, this Court may not substitute its judgment for that of the trier of fact and disturb the $175,000 damage award, unless the record clearly indicates that the award was based upon passion, prejudice, or improper motive, or is so excessive as to shock the conscience of this Court. *K-Mart Apparel Fashions Corp. v. Ramsey*, 695 S.W.2d 243, 247 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). We do not find such a clear indication in the instant case.

Point of error three is overruled.

■ Point of error four contends that the award for $475,000 in damages for the parents' mental anguish is so against the

great weight and preponderance of the evidence as to be manifestly unjust.

There was testimony at trial that Enrique's mother developed health problems soon after her son died. This included pains in her head, legs, and left arm, as well as nervousness. She now takes pills for high blood pressure and insomnia. She testified that not one day passes that she does not think about her son. Enrique's mother testified that the entire family has been saddened by Enrique's death to the point of making her ill. She has not told her two youngest daughters that Enrique has died because she knows that knowing this will make them ill.

Enrique's mother testified that her husband is sad and cries over Enrique's death. Enrique's father testified that his health had been perfect before his son's death, but that since the death, he has been somewhat ill and has developed a drinking problem. He stated that Enrique's memory hurts him and has injured his health. When he drinks, he cries for his son. He stated that not a day goes by that he doesn't think about his dead son and that he will never forget him. Enrique's father testified that his son wanted to pull the family forward because he didn't like to see them poor. Mr. Ledezma stated that he always thought that his son would be great because he always fought for his future.

Patricia Ledezma testified that since her brother's death, her mother has developed high blood pressure and is very nervous. Because of this, she has moved back to Mexico to be near her parents. She stated that her father has begun to drink, cries over Enrique, and has stated that he wants to die.

■ Mental anguish has been defined as an emotional response to the wrongful death itself. *Moore v. Lillebo,* 722 S.W.2d 683, 687 (Tex.1986). Awards for mental anguish should compensate the beneficiaries' pain, torment, and suffering experienced from the death of a family member. *Id.* at 688. Since *Sanchez v. Schindler,* 651 S.W.2d 249 (Tex.1983), a parent is entitled to recover damages for the mental anguish caused by the death of a child.

*Moore* holds that it is no longer necessary to prove that this mental anguish is physically manifested. 722 S.W.2d at 686.

The assessment of an award for mental anguish is not subject to precise calculation and is therefore particularly within the province of the trier of fact. *Gulf States Utilities Co. v. Dryden,* 735 S.W.2d 263, 268 (Tex.App.—Beaumont 1987, no writ). In the present case, the record does not clearly show that the $475,000 award for mental anguish was based upon passion, prejudice, or improper motive. *Ramsey,* 695 S.W.2d at 246.

Point of error number four is overruled.

In point of error number five, appellants complain of $100,000 in damages for loss of society awarded to Enrique's parents. They assert that this award is so against the great weight and preponderance of the evidence as to be manifestly unjust.

■ Loss of society is defined as the loss of the positive benefits that flowed from the love, comfort, companionship, and society to the family from the decedent's being a part of it. *Moore,* 722 S.W.2d at 688.

■ Testimony from Enrique's parents and sister was that Enrique was a generous young man who regularly brought home food, gifts, and school supplies for the whole family. Enrique always worked, gave money to his mother, and paid for his own expenses. Enrique's mother testified that she loved him very much and that she will never again have a child like him. There was testimony that Enrique was the one who organized the family get-togethers, unified the family, and was his parents' hope for someday not being poor. Enrique's mother testified that he would pay for doctor bills and medicine for his siblings and planned to purchase a house for her someday.

This testimony is sufficient evidence to uphold the trial court's award of $100,000 to the parents for loss of society.

Point of error five is overruled.

■ Point of error six states that the trial court erred as a matter of law in awarding damages to Enrique's parents for

grief and bereavement, in addition to mental anguish damages.

Appellants assert that there is no distinction between recovery for "grief and bereavement" and recovery for mental anguish, and that there should therefore be no separate recovery.

The words "grief and bereavement" have been called descriptive expressions of mental anguish and are not usually considered separate additional elements of damage. *Whipple v. Deltscheff,* 731 S.W.2d 700, 703 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). However, in *Missouri Pacific R.R. Co. v. Dawson,* 662 S.W.2d 740 (Tex.App.–Corpus Christi 1983, writ ref'd n.r.e.), the court in dicta noted that a distinction between a recovery for grief and bereavement and one for mental anguish is difficult, but the distinction can conceivably be drawn and proven by skilled members of the trial bar. *Id.* at 743. In such situations, the facts must support a finding of a causal relationship between a plaintiff's grief and bereavement and some injury, for a monetary recovery to be possible. *Id.*

Appellees claim that they prayed for grief and bereavement and mental anguish damages in their pleadings and closing argument and therefore differentiated between the two.

However, a review of appellee's first amended petition shows that the term "bereavement" was used as a basis of recovery in paragraph eight of the petition, but the term "grief" was not included. Furthermore, in the prayer of the petition, no request for a recovery of damages was made for "grief" or "bereavement."

Although the appellees requested damages for "grief and bereavement" in their final arguments to the court, they did not seek a trial amendment to include these items as a basis of recovery at any time.

We have also searched the evidence in the record to see if the appellees made an effort in the presentation of their case to distinguish between "mental anguish" and "grief and bereavement," and we can find no indication that they did. As a result, we can find no basis for a separate recovery for "grief and bereavement."

Appellants' point of error six is sustained.

The appellees have requested that this Court assess an additional award of 10 percent of their money damages against the appellants as a penalty for the unnecessary delay in payment of the trial court's judgment. In view of our disposition of this appeal, we find no basis for this contention.

The judgment of the trial court is reformed to delete the award of $25,000 to Juana Oviedo de Ledezma for "past" and "future grief and bereavement," and the award of $25,000 to Enrique Ledezma Torres for "past" and "future grief and bereavement." In all other respects the judgment of the trial court is affirmed.

COHEN, Justice, concurring.

I agree with the result reached in this case. However, I would follow *Whipple v. Deltscheff,* 731 S.W.2d 700, 703 (Tex.App.–Houston [14th Dist.] 1987, writ ref'd n.r.e.), and hold as a matter of law that "grief and bereavement" are elements of "mental anguish." I can find no basis to permit recovery of damages for "mental anguish," plus a separate, additional recovery for "grief and bereavement." If there is a distinction, it is a very fine distinction, and not worthy of the machinations required of litigants and courts attempting to avoid a double or overlapping recovery of damages. "Distinctions which are too fine are apt to lead to needless perplexities and purely legalistic results." *Houston Transit Co. v. Felder,* 146 Tex. 428, 208 S.W.2d 880, 883 (1948). It would be more fair to submit a single "mental anguish" issue, accompanied by an instruction broad enough to include every type of mental anguish, including "grief and bereavement," and all the others.