Jay FINKELSTEIN, Esquire, Personal Representative of the Estate of Harry Barman, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 88–648.

District of Columbia Court of Appeals.

Argued En Banc Sept. 19, 1990.

Decided June 5, 1991.

Brian W. Shaughnessy, with whom Richard S. Sternberg and Philip A. Gagner were on the brief, Washington, D.C., for appellant.

Susan S. McDonald, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, Washington, D.C., for appellee.

Elizabeth A. Karasik, Washington, D.C., filed a brief as amicus curiae on behalf of appellant.

Before ROGERS, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB, FARRELL, and WAGNER, Associate Judges, BELSON, Associate Judge, Retired,* and NEWMAN,** Senior Judge.

* Judge Belson was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on June 1, 1991.

** Judge Newman was an Associate Judge of this court at the time of argument. His status changed to Senior Judge on March 11, 1991.

ON REHEARING EN BANC

FARRELL, Associate Judge:

A division of this court reversed the trial judge's grant of a judgment notwithstanding the verdict and, in the alternative, a new trial. After reconsideration by the court *en banc*, we also conclude that the judge erred in granting judgment notwithstanding the verdict, but we sustain her grant of a new trial on the ground that the verdict was excessive.[1]

I.

Jay Finkelstein, as personal representative of the estate of Harry Barman, brought suit under the District of Columbia Wrongful Death Act, D.C.Code § 16–2701 et seq. (1989), and the District of Columbia Survival Act, D.C.Code § 12–101 et seq. (1989), against the District of Columbia for alleged negligence in causing the death of Harry Barman. The evidence at trial was summarized by the division, and we adopt its account with slight modifications.

Barman was arrested on a charge of simple assault on January 8, 1985. A forty-three-year-old male with a history of schizophrenia, he was committed to the custody of the D.C. Department of Corrections for pretrial evaluation. On January 10, a psychiatrist at the jail evaluated Barman and ordered him to South 3, the mental health unit of the D.C. Jail.

At about 10:00 a.m. on January 28, 1985, Barman was one of several inmates cleaning the showers of South 3 despite the fact that, because he had refused his medications, he had not been cleared for work detail. The shower areas were closely monitored from a guard station staffed by a minimum of one guard, at this time Correctional Officer Gloria Trotter. At about 10:30 a.m., Raymond Stroman, a physician's assistant, observed three of the inmates in the shower area of South 3 engaged in sexual activity with Barman. Stroman then left to check on the female residents in the upper cell block. Returning fifteen to twenty minutes later, Stroman observed that the activity was still going on. None of the jail personnel had intervened.

A second incident occurred in the shower area while Barman was on work detail. Two inmates sprayed Barman in the face with one of the chemical compounds used by the prisoners to clean the showers. After these two incidents Barman returned to his cell, remarking to a fellow inmate, Tyrone Lucky, that he was tired and going to lie down. He returned to his cell between 3:00 and 3:30 p.m.

At 3:45 p.m. Correctional Officer Joyce Webb noticed Barman slumped on the concrete floor of his cell. He had one arm on his bed and his head rested on his other arm; although the temperature of the cell was about sixty-five degrees, he was naked. Webb passed Barman's cell at 4:05 p.m. and again at 4:15 p.m.; both times he was in exactly the same position as when she first saw him. Webb passed Barman's cell a fourth time around 6:00 p.m. Although she observed that during two hours and fifteen minutes he had not changed his position, she at no time attempted to determine whether he needed attention. Sergeant Eiland also testified that he had observed Barman in his cell at 3:45 p.m. and 6:05 p.m., as well as two times in between without questioning Barman's unchanged condition. Shortly after 6:00 p.m., Tyrone Lucky reported to Officer Webb that he thought Barman was dead.

Gaynel Cowan–Dudrow, a physician's assistant, responded to a medical technician's

---

1. This court may review the granting of the new trial motion since it was made in conjunction with the motion for judgment notwithstanding the verdict. *Hines v. Safeway Stores, Inc.*, 379 A.2d 1174, 1176 (D.C.1978). *See* Super.Ct.Civ.R. 50(d) (1990).

Besides appealing from both of these orders of the trial court, appellant appeals from the trial judge's decision ordering plaintiff to pay the costs of the depositions and the fees of the court reporter for the depositions of Dr. Smialek and Gaynel Cowan–Dudrow taken by the defendant because of plaintiff's lack of diligence in preparing his case. Order by Judge Kessler, at 1 (Oct. 3, 1987). Within the four corners of this order we cannot review its conclusion. At an appropriate time, the trial court shall conduct a hearing on the merits, providing both parties the opportunity to brief the issue in accordance with Super.Ct.Civ.R. 26 and 37.

alert. As she approached Barman's cell, she noticed a strong odor of vomitus and excrement. Barman was naked and slumped partly on the floor and partly on his bunk. There was obvious venous pooling in his legs, and his pupils were fixed, dilated, and hazed over. He had abrasions over his eye and on his lip as well as contusions. Certified in advanced life support and surgery, Cowan–Dudrow immediately determined that Barman was beyond resuscitation; in her opinion he had been dead "a very long time." She observed that he had vomitus around his mouth, fecal matter and vomitus on his legs, and fecal matter around the rectal area. The floor area around him was streaked with fecal matter and vomitus, as though he had been "[dragged] to the bed with the excretion on the floor."

Other testimony at trial was inconsistent. Stroman testified that he had reported the incident in the shower to Correctional Officer Trotter, who in turn denied that Stroman had reported any incident. During his deposition Stroman had indicated that the three inmates were sodomizing Barman,[2] but at trial he testified that his reference to the inmates "screw[ing] the boy to death" had been in jest, and that he had really meant that the three inmates and Barman were engaged in mutual masturbation. Stroman acknowledged, at the same time, that he had tried to testify truthfully at his deposition and had done so. Tyrone Lucky and Correctional Officers Trotter and Murray testified that Barman never appeared nude in his cell, but Officers Webb and Eiland stated that they did not observe anything unusual about Barman that day because they had seen him praying in the nude on his cell floor on prior occasions.

Dr. John Smialek, Chief Medical Examiner for the State of Maryland and plaintiff's medical expert, testified that the cause of death was an acute attack of bronchospasm or asthma. Dr. Smialek concluded that he could not state precisely what Mr. Barman's attack was precipitated by because attacks of this type can occur spontaneously with no identifiable agent triggering them. But they typically can be precipitated by emotional stress and can be precipitated by some offending agent in the environment.

Based upon the evidence that Barman had been sprayed in the face with a substance called "deep gloss," Dr. Smialek opined that "this substance could possibly have been one of or the factor that led to the gradual onset of the symptoms that were part of the attack of bronchospasm...." It was also "certainly possible that a sexual attack would be sufficient to precipitate this particular type of acute episode." Dr. Smialek testified that a typical asthma attack reaches its full severity in one to eight hours and estimated that Barman's attack lasted at least two to three hours. It would have been accompanied typically by gasping or wheezing, with the result that he "was suffering considerable distress prior to his death." In Dr. Smialek's opinion, had there been intervention and medical treatment, even the severe attack that Barman suffered could have been reversed.[3]

Plaintiff's expert penologist was E. Eugene Miller, whose qualifications were not in dispute. He referred to the Standards for Adult Local Detention Facilities (Standards) promulgated by the American Correctional Association, explaining that the Standards are not mandatory but are used as the basis for a voluntary accreditation program around the country. According to Miller's testimony, correctional officers should observe normal inmates at least every thirty minutes and, if the inmates are mentally disordered, more frequently. Custodial officers should also maintain a complete record of pertinent information regarding individual inmates, which should include evidence of abnormal behavior such as kneeling in the cell nude. Miller testi-

---

**2.** In his deposition Stroman had stated: "The black boys had dicks in him"; "I ... told the [jail] residents[,] I say yeah. Then they screwed the boy to death when I got back."

**3.** The District's medical expert, Dr. Michael Baden, disagreed with Dr. Smialek's analysis of the autopsy data. He stated that there was little or no evidence to suggest that asthma was the cause of death, but could not determine the exact cause of death from the evidence.

fied that any group sexual activity among the inmates, either voluntary or not, would require intervention.[4]  Moreover, in his opinion it generally would be a violation of the national standard for correctional officers to observe Barman's unchanged and unusual position from 3:30 to 6:00 p.m. without attempting some type of intervention.

The jury returned a verdict of negligence against the District of Columbia and awarded $1 under the Wrongful Death Act claim and $30,000 under the Survival Act claim.  They also returned a verdict of negligent infliction of emotional distress, awarding $1 under the Wrongful Death Act claim and $1,000,000 under the Survival Act claim.  Damages against the District of Columbia thus totaled $1,030,002.

The trial judge granted the District of Columbia's motion for judgment notwithstanding the verdict and, in the alternative, a new trial.  The judge found that the plaintiff had failed to establish either a breach of the standard of care or causation, and so the District could not be found negligent in Barman's death.  In the event the judgment notwithstanding the verdict were reversed on appeal, the judge granted a new trial on three grounds: excessiveness of the damage award, improper admission of economic expert testimony, and improper exclusion of Barman's medical records.

## II.

■■■  We agree with appellant that the jury had before it sufficient evidence from which to find negligence by the District of Columbia that caused injury to Barman, and hence we reverse the grant of a judgment notwithstanding the verdict.  A judgment notwithstanding the verdict is proper only in cases "in which no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could

reach a verdict in favor of that party." *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100, 1103 (D.C.1986).  Viewing the evidence in that light, the jury could fairly have found that Barman returned to his cell in the afternoon of January 28 and, within the next two and a half hours, displayed visible symptoms of distress that required the guards to intervene with assistance.  The standard of care obliged the guards to check on Barman more frequently than every thirty minutes and to intervene where appropriate.  Either the guards breached the standard by not checking on Barman as frequently as they claimed or they ignored his obvious distress and refused to provide the medical intervention that would have prevented his death.  The jury could also have noted that despite the excuse of Officers Webb and Eiland that they frequently saw Barman nude in his cell in a praying position, no entry in the record book mentioned that Barman had ever prayed nude in his cell.  The jury could reasonably find that the failure of the officers to attend to Barman in the cell was negligent and contributed to his suffering and death.

There was also evidence that the District was negligent for permitting Barman to be out of his cell on work detail without having been cleared for that activity, as well as for permitting him to engage in sexual activity with other inmates in the shower without intervening.  And there was evidence in the form of Stroman's statements in deposition, which he reinterpreted but did not disavow at trial, that the sexual activity—sodomy—was involuntary and caused Barman injury.  The District argues that there was no medical evidence that either the sexual activity or the spraying with a cleaning chemical was the proximate cause of the asthma attack and hence of Barman's death.  We are inclined to agree.[5]  We also agree with appellant,

---

**4.** Miller offered no opinion on whether allowing Barman to be in a position where he could be sprayed with a cleaner was a deviation from reasonable care, stating, "I don't know if in this instance it reasonably could have been prevented."

**5.** Dr. Smialek, appellant's medical expert, was unable to provide an opinion about the cause of Barman's asthma attack "to a reasonable degree of medical certainty." *Baltimore v. B.F. Goodrich Co.*, 545 A.2d 1228, 1231–32 (D.C.1988).  Although he stated that "typically" the onset of asthma can be brought on by emotional stress

however, that this point is not decisive. Whatever caused Barman's asthma attack, the jury could properly find that the District committed distinct acts of negligence—allowing Barman to be out of his cell and to engage in group sexual activity, possibly against his will, and to be chemically sprayed; and allowing him to die from the asthma attack without intervention—that each resulted in compensable injuries. The trial court thus erred in granting judgment as a matter of law for the District.[6]

### III.

We reach a different result, however, in reviewing the trial judge's decision to grant a new trial on the ground that the verdict for pain and suffering was excessive.[7] Our review of that decision implicates both the substantive standard followed by the trial judge in ruling on such motions and the standard of appellate review in considering the trial court's ruling. As our previous decisions have made clear, the two are not the same and, indeed, the deferential nature of the latter stems directly from the strictness of the former. In *Taylor v. Washington Terminal Co.*, 133 U.S.App. D.C. 110, 409 F.2d 145, *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969), the United States Court of Appeals for the District of Columbia Circuit stated:

> In this jurisdiction particularly, District Court judges have given great weight to jury verdicts. They have stated that a new trial motion will not be granted [on grounds of excessive verdict] unless the "verdict is so unreasonably high as to result in a miscarriage of justice," or, most recently, unless the verdict is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate."

*Id.* 133 U.S.App.D.C. at 113–14, 409 F.2d at 148–49 (footnotes and citations omitted). Our own decisions, and hence the conduct of judges in the Superior Court, reflect a similar unwillingness to interfere with the jury's calculation of damages. As we stated in *Louison v. Crockett*, 546 A.2d 400 (D.C.1988):

---

or irritating substances in the environment, he testified only that it was "possible" that a sexual attack or inhaling spray cleaner could precipitate "this particular type of acute episode." Later he testified that it was impossible for him to identify the psychological factors that could have contributed to Barman's asthma attack. This testimony appears to fall short of providing "a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." *District of Columbia v. Freeman*, 477 A.2d 713, 716 n. 9 (D.C.1984).

**6.** Judge Wagner's separate opinion contends that "there is no proof that decedent's death was caused by infliction of emotional distress or mental disturbance," and hence the judgment n.o.v. on the count of negligent infliction of emotional distress brought under the Wrongful Death Act must stand. We are not so positive. Dr. Smialek testified that an attack of bronchospasm can be caused by emotional stress, and it would stand to reason—or so the jury could find—that Barman's emotional distress as he lay or knelt unattended in his cell compounded his physical distress and so contributed to his death. In any event, the District never made this argument in the trial court or on appeal (it had little incentive to given the jury's award of $1 for wrongful death), and we

are loath to reach out and decide an issue appellant has had no opportunity to brief.

**7.** The trial judge granted a new trial on two other grounds as well, neither of which we need consider in view of our disposition of the appeal. The judge concluded that there was an insufficient factual foundation for the testimony of appellant's economic expert. At a retrial, there may be the same or a different factual foundation, and the trial judge will be obliged to reconsider the admissibility of the expert's testimony in that setting. Second, the trial judge concluded that it had erred in precluding the District from introducing Barman's psychiatric records, and that this error deprived the jury of probative evidence relating to the possible cause of Barman's death. On appeal, however, as it concedes in its petition for rehearing, the District does "not seek to defend the grant of a new trial on the basis of the exclusion of Barman's psychiatric records from non-District hospitals." The District's position is that the exclusion of the records was at most "harmless [error], since the record would not have established any relevant facts" except one already proven by other evidence. *Id.* In these circumstances, in which the District concedes the essential irrelevance of the hospital records, we decline to consider an issue that in all probability will not arise in a retrial.

[T]rial courts have historically given great weight to jury verdicts, granting a new trial only where there are unusual circumstances which convince the trial judge, who has also heard the evidence and seen the witnesses, that the jury had been improperly influenced by non-germane factors or that its verdict is clearly unreasonable. When a party moves to strike a verdict as excessive, the trial court must consider whether that verdict resulted from passion, prejudice, mistake, oversight, or consideration of improper elements. The trial court must ask whether the verdict is beyond all reason, or ... so great as to shock the conscience.

*Id.* at 403 (citations and internal quotation marks omitted); *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 594 (D.C. 1985).

■ On appeal, this court " 'must accord great deference to the trial court's decision to grant or deny a motion for new trial based on excessiveness of the verdict and may reverse that decision only for an abuse of discretion.' " *Louison*, 546 A.2d at 403 (quoting *International Sec. Corp. of Va. v. McQueen*, 497 A.2d 1076, 1081 (D.C.1985)).[8] In *Vassiliades*, the court pointed out that this deference stems directly from the historical reluctance of trial judges to grant new trials on that ground except in unusual circumstances, 492 A.2d at 595, and that, as a result, "when the question of excessiveness is close, appellate courts give the benefit of every doubt to the trial court's judgment." *Id.* Of course, our role "is not merely to rubber-stamp the trial court's decision," *Lacy v. District of Columbia*, 408 A.2d 985, 988 (D.C.1979), *aff'd on reh'g*, 424 A.2d 317 (D.C.1980), and there must be "firm support in the record" for a finding of excessive verdict, *id.* But given both the traditional self-restraint exercised by trial courts in this area and the trial judge's " 'unique opportunity to consider the evidence in the living court-room con-

text,' " *id.* at 988–89,[9] we have followed the rule—and we do so today—that "we will reverse the grant of a new trial for excessive verdict only where the quantum of damages found by the jury was *clearly* within 'the maximum limit of a reasonable range.' " *Taylor*, 133 U.S.App.D.C. at 114, 409 F.2d at 149 (emphasis in original); *Vassiliades*, 492 A.2d at 594. Every doubt on that score will be resolved in the trial court's favor. *Vassiliades, supra,* 492 A.2d at 595.

■ In the present case, the trial judge concluded that "the jury's verdict of $1,030,002.00 was so excessive as to reflect sympathy, passion, prejudice, and a desire to punish the District of Columbia for maintenance of the prison conditions about which it heard such graphic testimony." The judge noted that plaintiff's expert economist had set the pecuniary loss to Barman's family at between approximately $50,000 and $62,000. The judge further determined that the "key issue at trial was what happened to Mr. Barman between the hours of 3:45 p.m. and 6:05 p.m."—the "approximately two hours and fifteen minutes from the last time that he was seen alive and not in distress to the time that his death was discovered." Therefore, based upon the economist's projections, the judge found that the jury awarded damages of between roughly $967,000 and $980,000 "for less than two and one-quarter hours of pain and suffering," and found no support in the record for a compensatory award of that magnitude for suffering of that duration.

Rather, the judge concluded that the reason for the excessive award lay elsewhere. She noted that "the picture of conditions at the D.C. Jail presented to the jury was a deeply distressing ... one" that caused "palpable" shock and disgust in the jury "as it heard testimony about frequent masturbation, nudity, sodomy, failure to clean up human wastes, and other bizarre behav-

---

8. We do so even though the trial judge, in her discretion, might have chosen the lesser remedy of a new trial conditioned on plaintiff's declining to accept a remittitur. *Munsey v. Safeway Stores,* 65 A.2d 598, 600 (D.C.1949).

9. "[A] trial court is in the best position to determine whether a verdict is the result of prejudice, passion, or mistake...." *Davis v. Abbuhl,* 461 A.2d 473, 476 (D.C.1983).

ior." Given "the squalid conditions described to the jury," the judge found, the award of nearly $1 million, though avowedly for pain and suffering, was intended "to 'send a message,' and a punitive message at that, telling the District of Columbia government that its citizens would not tolerate maintenance of such abominable conditions for its citizens, even those charged with violations of the criminal law."

We sustain the trial judge's ruling as we find firm support in the record for her determination that the award of damages was out of all proportion to the pain and suffering proven. Appellant assails the judge's finding at the outset by pointing out that she focused entirely upon the pain and suffering that accompanied the attack of broncho-spasm during the three hours or less in the afternoon, ignoring the independent suffering caused by the sodomous assault and spraying earlier that day. The record supports the trial judge's view, however, that for purposes of measuring Barman's pain and suffering, the critical period the jury considered was the time after he returned to his cell and suffered the acute asthma attack from which he died. The primary support for this view is that counsel for appellant, in his summation to the jury, limited his plea for damages for pain and suffering to the distress Barman suffered as he struggled and died in his cell unattended.

Counsel began his summation by arguing that "something happened to Harry Barman in the morning or early afternoon hours of January 28th": "[h]e either got gang raped, sodomized either voluntarily or involuntarily ...[; h]e was sprayed with some deep gloss[;] or he may have suffered some other sort of trauma, something that perhaps arose out of his condition." Counsel proceeded to state that around 3:00 p.m. Barman was locked in his cell, where,

> between 3 o'clock and 6:05 p.m., he went through a lot of distress. He must have traveled around the cell several times, and there came a time when he died.... But, he died in such a way that he did not die quickly. He must have flopped around for twenty minutes or a half hour

at a minimum, no matter who you believe, based on the physical evidence.

Counsel then argued that either not enough guard patrols had been carried out between 3:00 and 6:05 or there was lax observation during the patrols, and that the correctional officers' explanations were an effort "to justify leaving that man nude, in a position, kneeling in front of his bunk[,] for three hours in a high-care facility, ... nude in his cell for three hours in fecal matter and vomit...." Counsel reviewed the expert testimony concerning the cause of death, but concluded that "[i]t doesn't make that much difference [what caused the death] because it took a while for Barman to die, he suffered while he was dying, and there was an opportunity to intervene and do something about it...." Turning to the issue of damages and specifically pain and suffering, counsel explained that the jury

> must assess the impact on Mr. Barman and the extreme distress and discomfort that was caused by his thrashing around for a period of time in that cell while these people were supposed to be taking care of him. And, I would submit to you, that there is a significant compensation due Mr. Barman's estate because of his pain and suffering suffered by Mr. Barman during his death struggle at the D.C. Jail.

Nowhere in his summation did counsel ask for damages for the pain and degradation associated with a sexual assault or the distress caused by being sprayed in the face with a chemical compound.

Although appellant points to the complaint which sought damages for a sexual assault and the evidence from which the jury could find that Barman had been sodomized (rather than merely engaging in group masturbation), we cannot fault the trial court's determination that the jury considered the issue of pain and suffering on the terms in which it was argued to them—limited to Barman's suffering as he died slowly in his cell. The arguments of counsel are, of course, not evidence and the jury was so instructed here. But courts routinely assess the impact of instructional

formulations, for example, on the jury in the context of a party's theory of the case as argued to the jury, *see, e.g., United States v. Park,* 421 U.S. 658, 674–75 & n. 16, 95 S.Ct. 1903, 1912–13 & n. 16, 44 L.Ed.2d 489 (1975), and we see no reason why the precise damages urged in summation are not similar indication of the injury on which the jury focused in making its award. Here, counsel's strategy in ultimately requesting damages was to concentrate on Barman's death and the events immediately preceding it, perhaps regarding the evidence of his death throes as more forceful and unambiguous than the evidence that he had been "raped."[10] It was therefore reasonable for the trial judge to conclude that, by the time the case reached the jury, the "key issue" had become "what happened to Mr. Barman"—what suffering he had endured—during the three hours in his jail cell between 3:00 and 6:00 p.m.

Moreover, there was evidence permitting the judge to infer that this suffering had been substantially shorter in duration than the full three hours.[11] Gaynel Cowan–Dudrow, the physician's assistant who responded to the medical technician's alert and found Barman dead, testified that when she first saw him he had been dead "for a very long time[,] ... 45 minutes to an hour[,] maybe even longer."[12] Appellant's medical expert, Dr. Smialek, acknowledged that Barman could have died as much as two hours before his discovery at around 6:00 p.m. Although evidence of fecal smearing on Barman's body and the floor supported Dr. Smialek's opinion that he had been "suffering considerable distress prior to his death," there was also testimony that throughout most of the three hour period, he remained stationary in the same position in which he was found dead.

Under these circumstances, we cannot conclude that the award for pain and suffering was *clearly* within the maximum limit of a reasonable range, *Taylor, supra,* and hence that the trial judge abused her discretion. Concededly pain and suffering "is not susceptible to any sort of precise calculation," *Lacy v. District of Columbia,* 408 A.2d at 989, and the physical and emotional pain that occurs in the minutes or hours before death is unquestionably unique in intensity. *See Capitol Hill Hosp. v. Jones,* 532 A.2d 89, 92 n. 12 (D.C. 1987) (patient's "inferable conscious awareness of impending death could be considered in the pain and suffering calculus"). Our cases have also cautioned against facile comparison of verdicts in deciding the issue of excessive damages, pointing out that "[e]ach case in this area necessarily rises or falls on its own facts...." *May Dep't Stores Co. v. Devercelli,* 314 A.2d 767, 775 (D.C.1973); *Capitol Hill Hosp.,* 532 A.2d at 93. Nevertheless, our decisions point to the conclusion that an award of approximately $1,000,000 for pain and suffering of a duration the trial judge could reasonably find did not exceed two and a quarter hours is, at the very least, "at the outer limits of the maximum range of a reasonable verdict," *Vassiliades,* 492 A.2d at 595—which is all we need decide.

In *Capitol Hill Hospital,* for example, a terminally ill diabetic admitted to the hospital with complications was negligently tak-

---

10. As explained earlier, the evidence of sexual assault consisted of Stroman's deposition statement that the inmates "had dicks in [Barman]" and "screwed the boy to death," testimony that he recharacterized at trial to mean group masturbation (Barman "was enjoying it"), only to finish by saying that he had tried to tell the truth in his deposition and had done so. As Barman returned to his cell sometime after the episode, he told Tyrone Lucky merely that he "felt tired and was going to his room and lie down." Appellant's counsel took pains at trial to establish through his expert penologist that the District was negligent in allowing the sexual activity in the shower to continue regardless whether it had been voluntary or involuntary.

11. We have stated that "[i]n considering a motion for a new trial, the trial judge must consider all the evidence and is not required to view the evidence in the light most favorable to the nonmoving party." *Weinberg v. Johnson,* 518 A.2d 985, 993 (D.C.1986) (citing *Rich v. District of Columbia,* 410 A.2d 528, 534–35 (D.C.1979)).

12. His jaw was stiff, all the blood had left the upper part of his body, and his skin was very cold to the touch.

en off supplemental oxygen and struggled to breathe for forty-five minutes before dying from cardiac arrest. In view of the suffering shown particularly by "his attempts to resort to a useless oxygen mask during the 45–minute period after the oxygen was turned off," we sustained the trial judge's refusal to disturb an· award of $100,000 for pain and suffering, but observed that "in the context of the cases cited to us, this verdict may have been at the high end of the permissible spectrum...." 532 A.2d at 92–93. In *Lacy, supra,* we sustained the trial judge's finding that a verdict of $640,000 was excessive to compensate for the psychological trauma suffered by a child who had been sexually assaulted as many as three times by the janitor at her elementary school. Although the trial judge (Belson, J.) was sensitive to the fact that "the jury must normally be relied upon to arrive at a fair assessment of damages for such injuries as pain and suffering, mental anguish and distress, and psychological damage," 408 A.2d at 987, we agreed with him that, under the circumstances, the verdict of $640,000 was "beyond the maximum limit of a reasonable range within which the jury may properly operate." *Id.* at 989. *See also District of Columbia v. Gandy,* 450 A.2d 896, 902–03 (D.C.1982) (upholding $275,000 award for false arrest and assault and battery where plaintiff was jailed overnight, racially taunted and beaten by police, and suffered from physical injuries for one month; noting that court will not reverse absent abuse of discretion "[e]ven though we may consider the verdict for compensatory damages to be larger than it should have been, and think that it might have been reduced by the trial court"), *vacated,* 454 A.2d 328 (D.C.), *reinstated in pertinent part,* 458 A.2d 414 (D.C.1983).[13]

The trial judge was convinced that the gross disproportion between Barman's proven pain and suffering and the size of the damage award reflected the jury's determination to punish the District for tolerating the squalid conditions at D.C. Jail of which it had heard so much evidence. The court therefore exercised her authority to set aside a verdict that had been "improperly influenced by nongermane factors," *Vassiliades,* 492 A.2d at 595; *Smith v. Executive Club, Ltd.,* 458 A.2d 32, 37 (D.C. 1983) ("considerations of an improper element" justify setting aside verdict as excessive), inasmuch as punitive damages may not be awarded against the District of Columbia. *Smith v. District of Columbia,* 336 A.2d 831, 832 (D.C.1975). Appellant makes essentially three responses to the trial judge's finding of improper motivation. First, he argues that it rests upon the false premise that an award of compensatory damages may not properly serve a deterrent or punitive purpose, when the truth is otherwise. *See, e.g., Carter v. District of Columbia,* 254 U.S.App.D.C. 71, 93 & n. 18, 795 F.2d 116, 138–39 & n. 18 (1986) (compensatory damages are intended, at least partly, to serve a deterrent function, and plaintiffs may point this out to jury). But an intent to punish the defendant for tolerating conditions that have not caused injury to the individual plaintiff is not a proper basis for compensatory damages. Second, appellant argues that much of the testimony about rampant masturbation, nudity, and throwing of excrement was adduced by the District of Columbia on cross-examination of witnesses to bolster its defense that the guards had not been negligent in supervising inmates, including Barman, in the mental health unit who regularly—and largely unpreventably—engaged in aberrant behavior. We may concede that this is so, and that the District assumed the risk that this testimony would backfire and contribute to the jury's finding of negligence in the District's failure to monitor Barman (and others) and intervene to prevent his death. But we are unwilling to go further and let that evidence—and

13. *See also Duren v. Suburban Community Hosp.,* 24 Ohio Misc.2d 25, 495 N.E.2d 51 (C.P. Cuyahoga County 1985) (judge reduced $1 million verdict by half in case where hospital virtually ignored patient for hours until death despite fact he was in "obvious pain"); *Phillips v.* *Eastern Maine Medical Center,* 565 A.2d 306 (Me.1989) (court reduced $740,000 award for pain and suffering to $370,000 where jury seemingly was influenced by fact that death ultimately ensued).

the revulsion it incited in the jury—provide the basis for a compensation award that the trial judge reasonably found incommensurate with Barman's actual pain and suffering.

Finally, it is suggested that since the District apparently considered much of this evidence of sordid behavior important to its defense, a new trial would have little point because the same conditions will be described to the next jury which may similarly be inflamed by it. We are not persuaded, however, that the trial judge erred in concluding that another jury, perhaps aided by augmented instructions, will adhere more faithfully to the correct standards in computing compensatory damages. Moreover, the District will be on notice that the trial judge may not be so willing a second time to find in evidence the District itself substantially introduced the cause of an excessive verdict.[14]

\*      \*      \*      \*      \*      \*

Judge Ferren's dissent charges that our holding rests on an "incredibly radical,"

unprincipled notion that plaintiff "waived" his right to full damages by restricting his plea for compensation in closing argument to the suffering Barman endured in his jail cell in the afternoon.[15] The dissent misunderstands our analysis, which has nothing to do with waiver but instead inquires whether the record supports the trial judge's finding that the jury's award of damages lacked all proportion to the pain and suffering plaintiff established and argued to the jury. The dissent purports to agree that we review this finding deferentially and may disturb it only if the jury's award was *"clearly* within 'the maximum limit of a reasonable range,' " *Taylor,* 133 U.S.App.D.C. at 114, 409 F.2d at 149 (emphasis in original). But the dissent does not come to grips with a key reason for that deference—the judge's unique vantage point and "opportunity to consider the evidence in the living court-room context," *Lacy,* 408 A.2d at 988–89.[16] Even when this court reviews *de novo* a trial court ruling, as on the issue of constitutional harmless error, we have acknowledged the

---

**14.** In view of at least one of the additional grounds on which the trial judge granted a new trial, see note 7, *supra,* it is apparent that the new trial order extended to liability as well as damages. Even if the only basis for the order were excessiveness of the verdict, however, on the facts of this case we would be constrained to direct a new trial on both liability and damages. Given the separate acts of negligence the jury properly could have found, see pages 594–595, *supra,* we cannot know confidently which act or acts formed the basis of its finding of liability. Thus, while in a retrial on damages the jury could be told *that* liability had been found, it would be at a loss to know the specific conduct for which it was being asked to consider damages. In these circumstances the issues of fault and damages are too intertwined to permit a retrial on the latter alone. *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500–01, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931) (partial new trial "may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the other that a trial of it alone may be had without injustice"); *Weinberg,* 518 A.2d at 993. *See also Jamison Co. v. Westvaco Corp.,* 526 F.2d 922, 935 (5th Cir.1976) ("our uncertainty as to the jury's resolution of the liability issue ... forecloses [partial new trial] method").

Furthermore, it is apparent to us that the trial judge concluded that the evidence of squalor at the jail unfairly influenced the jury with respect to liability as well as damages, hence requiring

a new trial on both. The judge did not abuse her discretion in this regard, even though we have acknowledged that much—though not all—of the evidence of bedlam-like conditions was elicited by the District in its defense.

**15.** The dissent labors to show that plaintiff's counsel did not limit his closing argument in this way, but the effort is unconvincing. Certainly counsel mentioned, a single time, the asserted acts of sodomy and chemical spraying as possible causes of Barman's suffering—along with the equal possibility that the trauma "arose out of his [asthmatic] condition," unrelated to those events. Counsel proceeded to explain, however, that "[i]t doesn't make much difference" what caused Barman's death because— and this was counsel's theme—"it took a while for Barman to die, he suffered while he was dying, and there was an opportunity to intervene and do something about it." No amount of reconstruction can alter the fact that counsel directed his appeal for damages to the "extreme distress and discomfort that was caused by [Barman's] thrashing around for a period of time in that cell while these people were supposed to be taking care of him."

**16.** *See also Munsey,* 65 A.2d at 600 ("Having seen the witnesses and heard the testimony, [the judge] was in a much better position to pass on the question [of excessive damages] than we are.")

judge's "operational advantage ... in making a determination requiring intimate acquaintance with the facts of the particular case as they evolved at trial." *Davis v. United States,* 564 A.2d 31, 34 (D.C.1989) (en banc). Even more so then must our review of the judge's decision to grant or deny a new trial, one intimately committed to her discretion and on which she may weigh the evidence independently,[17] entail a careful effort to replicate the judge's perspective and resolve any reasonable uncertainty in favor of her ruling.

Here the judge concluded that "the key issue" in respect to damages "was what happened to Mr. Barman between the hours of 3:45 p.m. and 6:05 p.m." Having watched the evidence unfold, the judge saw that plaintiff himself then narrowed the issue of damages for pain and suffering to this critical afternoon period in closing argument.[18] Judge Ferren's dissent asserts that our emphasizing closing argument ignores the fact that "a party is not even required to make a closing argument," but this latter point, while true, is irrelevant: we deal here not with a hypothetical case but a real one in which plaintiff did argue to the jury, forcefully, and limited his appeal for damages to Barman's suffering in the cell. The dissent speculates that plaintiff's counsel, preferring to let the evidence of the morning assaults speak "powerfully

for itself" on damages, intentionally downplayed that evidence to avoid inflaming the jury and inviting objection. But that motivation would be plausible, and more importantly relevant, only if appellant were correct—and the judge clearly wrong—in evaluating the harm Barman suffered from the District's negligence in the morning. We know the judge viewed as weak the evidence of injury traceable to the sexual activity and spraying which the District failed to prevent; she granted a motion for judgment notwithstanding the verdict partly on grounds of causation. We have reversed that judgment because the evidence was legally sufficient on both negligence and causation. But especially given the ambiguity in Stroman's testimony as to what took place in the shower, see note 10, *supra,* we are unwilling to second-guess the judge's appraisal of the evidence and conclusion that, in the jury's mind (assisted by plaintiff's argument), the issue of fault and damages came down to "what happened to Mr. Barman between the hours of 3:45 p.m. and 6:05 p.m." [19]

Despite her instructions to the jury to avoid a judgment based on prejudice, the judge concluded that something had gone awry in the jury's award of damages greatly out of proportion to the suffering shown and for which plaintiff ultimately sought relief. The issue on appeal is not whether

---

**17.** *Weinberg v. Johnson, supra* note 11, 518 A.2d at 993 (citation omitted).

**18.** Judge Wagner, much like Judge Ferren's dissent, argues that in determining whether a damage award is excessive, and specifically what considerations may have influenced the verdict, the trial judge may not look at how counsel's closing argument shaped the issues for the jury. *Post* at 616 ("This evaluation cannot be accomplished by reference to closing argument"). But facts are not tried to a jury in a vacuum; they are the material with which counsel "sharpen and clarify the issues for resolution" in closing argument. *Cf. Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975). Thus to tell the trial judge she may not consider closing argument is to ignore a key aspect of her unique "opportunity to observe the trial as it unfolds," *Davis,* 564 A.2d at 41, in a matter such as this committed to her discretion.

**19.** In the postscript to Judge Ferren's dissent, it is said that by reversing the grant of judgment

notwithstanding the verdict, we have "repudiate[d] the trial court's evidentiary premise" in granting a *new trial.* That would be true only if the two forms of relief—and the judge's corresponding authority—were the same, which it is elementary they are not. In granting the first motion, the judge concluded that the proof failed to support liability and even nominal damages for the morning sexual activity and spraying. In granting the alternative relief, she was convinced from both the weakness of that proof and, we must assume, plaintiff's compression of the case in closing argument that the jury focused on the afternoon events and awarded damages for that pain and suffering. In reversing the first ruling we do not logically disturb the basis of the second. Being wrong on the legal sufficiency of the evidence does not bar a judge, wearing a considerably different hat in deciding a new trial motion, from being right in judging what evidence the jury looked to in awarding damages and whether it supported that award.

this court, or any member of it, would have made the same determination. Pain and suffering are difficult in any circumstances to quantify, and there is undeniable truth in the comments of the trial judge in *Duren v. Suburban Community Hosp., supra* note 13 (who nonetheless reduced a $1 million verdict for pain and suffering by half):

> Surely, almost any person would say he could endure great pain in exchange for one million dollars, but what amount can compensate a person who may know that such pain would result in death? A court cannot remove itself into the confines of a sterile setting and abstractly use legal standards that have withstood the assault of time to reduce a verdict solely because of its size.

24 Ohio Misc.2d at 32, 495 N.E.2d at 59. But this court does not sit in the role of trial judge, and in reviewing the judge's action in this case on a matter committed closely to her discretion, it is well to bear in mind Judge Learned Hand's observation: "As is true of most that takes place in a trial, the right result is a matter of degree, and depends upon the sense of measure of the judge." *United States v. Freundlich,* 95 F.2d 376, 379 (2d Cir.1938).

For the foregoing reasons, the order granting judgment notwithstanding the verdict is reversed and the order granting a new trial is affirmed.

*So ordered.*

FERREN, Associate Judge, with whom NEWMAN, Senior Judge, joins, concurring in part and dissenting in part:

I agree with the majority in reversing the judgment notwithstanding the verdict, but I respectfully dissent from affirming the order granting a new trial. I would reinstate the verdict.

The majority sustains the new trial order because of agreement with the trial court's ruling that the " 'key issue at trial was what happened to Mr. Barman between the hours of 3:45 p.m. and 6:05 p.m.'—the 'approximately two hours and fifteen minutes from the last time that he was seen alive and not in distress to the time that his death was discovered.'" *Ante* at 596. The majority accordingly agrees with the trial court's post-trial ruling that the jury could not have properly considered, for purposes of compensatory damages, the "sodomous assault and spraying [with a cleaning chemical] earlier that day." *Ante* at 597. The majority's only justification for doing so is that "counsel for appellant, in his summation to the jury, limited his plea for damages for pain and suffering to the distress Barman suffered as he struggled and died in his cell unattended." *Ante* at 597. And again: "Nowhere in his summation did counsel ask for damages for the pain and degradation associated with a sexual assault or the distress caused by being sprayed in the face with a chemical compound." *Ante* at 597. I believe this rationale for rejecting the jury's verdict is altogether unjustified.

First, the majority slights the facts: plaintiff-appellant, supported by the trial court's instructions, did present to the jury the damage claims for Barman's pain and suffering not only from his death throes in the cell but also from the earlier sodomous assault and chemical spraying—including references to both in closing argument. Accordingly, the jury properly considered compensatory damages for pain and suffering not merely for 2¼ hours but for up to 7½ hours, or over five hours more than the trial court, in its post-trial ruling, allowed. Second, there is no basis in law for holding that, when a claim for damages is tried before a jury with evidence sufficient for a plaintiff's verdict, the trial court may deem a claimed element of damages waived unless plaintiff's counsel expressly reaffirms it in closing argument. Indeed, this waiver argument fails very simply because a party is not even required to make a closing argument. An election to make one, emphasizing certain points, cannot serve to scuttle an aspect of the case not stressed at that time. Finally, without an announced waiver of damages for the sodomous and chemical assaults, limiting the period of injury to 2¼ hours, there is no discernible reason for concluding the jury based its award, in part, on passion or prejudice.

## I.

One can easily demonstrate from record references in the Appendix to this dissent that plaintiff-appellant sought compensatory damages for pain and suffering from the chemical spraying with Johnson's Deep Gloss (complaint) and from the sodomous assault (amended complaint). The sodomous assault was emphasized again in the pretrial statement and in the pretrial order.

In opening statement to the jury, plaintiff's counsel told the jury it would hear evidence that Barman was "sexually attacked" in the morning, was also "sprayed with some sort of an industrial cleaner[,] probably deep gloss material made by Johnson's," and died from a bronchospasm that "could have had its origin in the traumatic experience of the sodomization, or in the spraying with the deep gloss...."

At trial, a jail resident, Tyrone Lucky, testified that he had seen "another resident spray the can—spray the can in [Barman's] face" when they were cleaning a shower. The jury also heard one of the defendants, Physician Assistant Raymond Stroman, testify that he had seen Barman on shower-cleaning detail when Stroman "came on the unit about 10:30 in the morning," and that he had twice observed three inmates engaging in sexual acts with Barman in the shower over a period of at least 15 to 20 minutes. (Stroman's deposition testimony, with which plaintiff's counsel confronted him before the jury, referred to acts of sodomy. After this reminder, Stroman acknowledged he had chided the inmates for "screw[ing] the white boy to death" and that he had testified truthfully on deposition.) The jury then heard Dr. John Smialek, Chief Medical Examiner for the state of Maryland, testify that Barman "had died of an acute attack of bronchospasm" that could possibly have been caused by the Deep Gloss or by a sexual attack. E. Eugene Miller, plaintiff's expert penologist, testified that under the appropriate standard of care correctional officers should observe inmates every thirty minutes and, for mentally disordered inmates, even more frequently. Miller added that correctional officers should intervene when any incident

of sodomy, voluntary or involuntary, is observed.

In discussing jury instructions with counsel, the trial court referred to Dr. Smialek's testimony: "there is certainly enough testimony in this record from Dr. Smialek to indicate that on his theory at least, if the jury accepts it, that Mr. Barman went through a great deal of pain and suffering before he died." The court then gave the jury very broad instructions on damages from pain and suffering, including:

If you find for the plaintiff, then you shall award to the plaintiff a sum of money which will fairly and reasonably compensate for all the damage suffered which was caused by the defendant.

\* \* \* \* \* \*

You may consider the extent and duration of any bodily injury which was sustained. You may consider the effect that such injuries had on the overall physical and mental health and wellbeing of the plaintiff. You may consider any physical pain and mental anguish that the plaintiff did suffer. You may consider any inconvenience or discomfort that the plaintiff suffered....

\* \* \* \* \* \*

If you find for the plaintiff on liability, you must make an award for any pain and suffering suffered by the deceased, Mr. Harry Barman, between the time of injury and the date of this death.... Your award should include reasonable compensation for any bodily injury, disability, mental anguish, disfigurement and/or deformity, and inconvenience and discomfort suffered by the deceased between the time of the injury to the time of his death.

Finally, in closing argument, plaintiff's counsel did not ignore the chemical spraying and sexual assault:

[S]omething happened to Harry Barman in the morning or early afternoon hours of January 28th, when he was incarcerated at South 3, the mental health unit, the maximum care type facility in the District Jail. Something happened to him. He *either got gang*

*raped, sodomized either voluntarily or involuntarily, if you believe Mr. Stroman one way or the other. He was sprayed with some deep gloss, or he may have suffered some other sort of trauma,* something perhaps that arose out of his condition. But, something happened to the man.

At around 3 o'clock, he was locked down in his cell, Cell 29 at the D.C. Jail, where between 3 o'clock and 6:05 p.m., he went through a lot of distress. He must have traveled around the cell several times, and there came a point when he died, and he died of one or two things, perhaps, depending on who you believe. But, he died in such a way that he did not die quickly.

He must have flopped around for twenty minutes or a half hour at a minimum, no matter who you believe, based on the physical evidence. And then he died and he stayed in this kneeling position for some period of time until finally he was discovered at 6:05 p.m. by the correctional officers who were there to take care of him. [Emphasis added.]

\* \* \* \* \* \*

If you will recall, Dr. Smilac [Smialek], who is the chief medical examiner of Baltimore, and a very experienced person, testified. He testified in a clear and uncontradicted, unshaken by cross examination, in a clear, uncontradicted manner, that Mr. Barman, through his observations of the scene and, importantly, the slides which he had reflected on, had died of an acute bronchospasm.

And what is this acute bronchospasm? It is an onset—an acute onset of this underlying condition, albeit unreported, of asthma that Mr. Barman suffered from. *And, that it was triggered by one of the causes I suggested to you earlier.* [Emphasis added.]

\* \* \* \* \* \*

But, you must assess the impact on Mr. Barman and the extreme distress and discomfort that was caused by his thrashing around for a period of time in that cell while these people were supposed to be taking care of him.

And, I would submit to you that there is a significant compensation due Mr. Barman's estate because of this pain and suffering suffered by Mr. Barman during his death struggle at the D.C. Jail.

Government counsel, in reply, conceded:

If the District of Columbia did anything—anything at all, or failed to do something that killed Mr. Barman, the District, like anybody else, must pay. That's the law. That's the law.

Viewing the evidence in light most favorable to the plaintiff (see Appendix), I believe the jury reasonably could have found that Barman, a healthy pre-trial detainee, was sodomized in the shower beginning no later than 10:30 a.m. and continuing over a period of at least 20 minutes; that another inmate assaulted Barman with a chemical spray sometime during the late morning or, possibly, in the early afternoon while Barman was in the shower area on cleaning detail; that because Barman had refused his medications he had not been cleared for cleaning detail; that the guards were, at the very least, negligent in allowing Barman to be in the shower area on cleaning detail at a time when Deep Gloss was used; that Barman suffered degradation and physical asthmatic symptoms from the time of the sodomy or the spraying; that between 3:00 p.m. and 6:00 p.m. Barman—possibly aware of impending death—died of a bronchospasm caused by the sexual attack or the chemical spraying; that whether or not Barman had asked for help during the day, no one had responded until a fellow inmate, Tyrone Lucky, finally brought Barman's condition to a guard's attention shortly after 6:00 p.m.; that according to the applicable standard of care correctional officers should have observed normal inmates every thirty minutes and mentally impaired inmates more frequently; that Barman's pain, suffering, and death were preventable; that all the guards had failed to observe or to intervene during Barman's sodomy, chemical spraying, and death struggle; that the District, therefore, had failed to provide reasonable care under the circumstances; and that plaintiff was entitled to damages for Barman's pain and

suffering over a period of 7½ hours beginning with the sexual assault and the chemical spraying as early as 10:30 in the morning.

Given this record, I can find no basis for the trial court, and for a majority of this court, to say that damages for pain and suffering must be limited to a period of 2¼ hours once Barman had returned to his cell in the afternoon—unless plaintiff can be found to have waived the claim for an element of damages attributable to pain and suffering from the chemical spraying and the sexual assault. I turn now to that issue.

## II.

The majority does not dispute that the complaint/amended complaint alleged chemical and sexual attacks and that the evidence supports findings that they occurred. *See ante* at 592–593. Nor does the majority dispute that plaintiff could have been compensated for Barman's pain and suffering from the sexual assault and the chemical spraying if, in fact, those claimed elements of damage were still before the jury when it retired to deliberate.[1] *See ante* Part II. Although the trial court granted the District's motion for a directed verdict on count V of the complaint—aiding and abetting the sexual assault and the spraying with Deep Gloss—this ruling did not remove that evidence from the case for purposes of damages under the theories of other counts, such as the negligent infliction of emotional distress the jury found under the Survival Act.[2] Thus, the majority analysis has to stand for the proposition that a plaintiff waives a claim for all damages not specifically mentioned in counsel's closing argument to the jury. This is an incredibly radical, and I believe insupportable, proposition—especially because counsel may waive closing argument altogether without being deemed to nonsuit the case.[3]

The majority necessarily implies that if Barman's counsel, in closing, had more than merely mentioned the sodomous assault and the chemical spraying, the trial court likely would have abused its discretion in granting a new trial. The fact that counsel chose instead to emphasize Barman's death struggle surely cannot, without a more explicit concession, amount to a partial waiver of damages for pain and suffering from the two earlier assaults. The majority cites no authority for that proposition, and I can find none.

The majority's only basis for its approach is an analogy that does not work. Judge FARRELL cites a criminal case, *United States v. Park*, 421 U.S. 658, 674–75 & n. 16, 95 S.Ct. 1903, 1912–13 & n. 16, 44 L.Ed.2d 489 (1975), in which the Supreme Court sustained a conviction against an argument that one of the jury instructions was erroneous. The Court agreed that "isolated parts" of the jury instruction could be read, erroneously, "as intimating that a finding of guilt could be predicated solely on respondent's corporate position." 421 U.S. at 674, 95 S.Ct. at 1912. But the Court ruled that the entire charge to the jury "[v]iewed as a whole ... fairly advised" what the applicable law was. The Court added that " '[o]ften isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire record of the *trial.*' " 421 U.S. at 674–75, 95 S.Ct. at 1912–13 (citation omitted) (emphasis in original). The Court then noted that "the jury could not have failed to be

---

**1.** The majority concludes: "Whatever caused Barman's asthma attack, the jury could properly find that the District committed distinct acts of negligence—allowing Barman to be out of his cell and to engage in group sexual activity, possibly against his will, and to be chemically sprayed; and allowing him to die from the asthma attack without intervention—that each resulted in compensable injuries." *Ante* at 594–595.

**2.** D.C.Code §§ 12–101 *et seq.* (1989); *see Doe v. Binker*, 492 A.2d 857 (D.C.1985) (damages for pain and suffering under Survival Act).

**3.** According to R. Haydock & J. Sonsteng, TRIAL: THEORIES, TACTICS, TECHNIQUES § 11.2 G (1990), "The attorney is not required to summarize or comment upon all the facts, opinions, inferences, and law involved in the case. A failure to comment on and refute a credible position or defense developed by opposing counsel, however, may be a mistake."

aware" of the main issue, in part, because of the prosecutor's evidentiary summation to the jury. 421 U.S. at 675, 95 S.Ct. at 1913. The Court, therefore, concluded that an arguably erroneous jury instruction was saved by reference to the entire charge to the jury, to the evidence at trial, and to the prosecutor's closing argument that focused the jury's attention on details which the disputed instruction itself erroneously did not require the jury to consider.

It is one thing to say, as the Supreme Court did in *Park*, that a criminal conviction can be saved by showing that the jury, with the help of closing argument, must have relied on a theory of the case, grounded in the evidence, which the court's instructions may not have adequately covered. It is quite a different thing to say that the jury, simply by listening to plaintiff's closing argument in which certain aspects of the case were highlighted but no claim was expressly waived, should nonetheless have been led to *ignore* evidence which the complaint, the court's instructions, and the trial evidence permitted the jury to consider. *Park* comes nowhere close to saying that counsel implicitly waives a plaintiff's claim for damages in a civil case simply by omitting or downplaying reference, during closing argument, to certain trial evidence.

In any event, the implied waiver theory makes no sense for three reasons: First, in closing argument to the jury plaintiff's counsel did refer to the sexual and chemical assaults. He specifically pointed out that Barman

> either got gang raped, sodomized either voluntarily or involuntarily, if you believe Mr. Stroman one way or the other. He was sprayed with some deep gloss, or he may have suffered some other sort of trauma, something that perhaps arose out of his condition.... [He] died of an acute bronchospasm ... an acute onset of this underlying condition, albeit unreported, of asthma that Mr. Barman suffered from. And, that it was triggered by one of the causes I suggested to you earlier.

*Accordingly, this court's perception of waiver based on closing argument is, to say* the least, surprising. It is true that counsel, near the end of his opening summation to the jury, emphasized that "there is a significant compensation due Mr. Barman's estate because of this pain and suffering suffered by Mr. Barman during his death struggle at the D.C. Jail." But this matter of emphasis cannot properly be seen as a waiver, especially because counsel did refer to the two morning assaults earlier in closing argument.

Second, plaintiff's counsel was careful in closing argument not to inflame the jury by indicting the District of Columbia correctional system as a whole. I could find no objection by government counsel that plaintiff's counsel's rhetoric was inflammatory. Conceivably plaintiff's counsel downplayed the sodomy and Deep Gloss incidents to avoid such an objection; or perhaps counsel simply believed the evidence of these assaults spoke powerfully for itself and he wished to reemphasize Barman's quieter but substantial suffering in his cell. The point is, however, that by forcing a plaintiff's counsel in closing argument to highlight—or else waive—every element of damages, the majority takes a step toward compelling argument to the jury that may become excessive. Better that counsel, not this court, decide how the evidence should be argued to the jury in plaintiff's interest.

Finally, the rules of civil procedure make clear that claims should be relatively easy to assert and difficult to dismiss. For example, if an opposing party moves to dismiss under Super.Ct.Civ.R. 12(b)(6) for failure to state a claim, the plaintiff is given an opportunity to amend under the mandate of Super.Ct.Civ.R. 8(f) that pleadings should be construed liberally to do substantial justice. *See* 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1215 (1990). Similarly, Super.Ct.Civ.R. 15(b) permits amendment of the pleadings after judgment to conform to the evidence if the issue was tried by express or implied consent of the parties. *See Moore v. Moore*, 391 A.2d 762, 768 (D.C.1978). It is true that, once a claim survives a Rule 12(b)(6) motion or other motions designed to produce an involuntary dismissal or judgment

for defendant, the action may later be dismissed voluntarily under Super.Ct.Civ.R. 41(a). But this requires a stipulation of the parties—an unequivocal statement that dismissal is intended. *See* 9 C. WRIGHT & A. MILLER § 2363 (1971). This requirement, of course, is directed at an entire count or claim, not necessarily to an element of damages. But the principle is informative and is altogether at odds with the notion that a plaintiff's counsel shall be deemed unilaterally to waive a particular item or quantum of damages upon a complaint or count properly before the jury simply by *omitting* reference to those particular damages during closing argument. The majority's approach is jurisprudentially unique—and unprincipled.

### III.

The question then becomes whether there is any valid basis to infer—irrespective of any waiver—that the jury to some extent awarded damages for a punitive, not merely a compensatory, purpose. We have said that our standard of review requires "close scrutiny" of the trial court's order:

> The decision whether to grant a new trial because damages are excessive is entrusted to the sound discretion of the trial judge. The trial judge must determine whether the award indicates prejudice, passion or partiality or was based on oversight, mistake or consideration of an improper element. This court will reverse the trial judge's determination only for an abuse of discretion. This standard of review contemplates "close scrutiny" to determine whether "there is firm support in the record for a finding by the trial judge that the verdict is 'so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate,' given the respect accorded the judge's 'unique opportunity to consider the evidence in the living court-room context.'" [Citations omitted]

*Weinberg v. Johnson*, 518 A.2d 985, 994 (D.C.1986). We have stressed, moreover, that when the trial court grants a new trial because the verdict is excessive, that ruling requires closer scrutiny than a decision denying a new trial (or granting a new trial based on legal error). *See Rich v. District of Columbia*, 410 A.2d 528, 535–36 (D.C. 1979) (citing *Taylor v. Washington Terminal Co.*, 133 U.S.App.D.C. 110, 113, 409 F.2d 145, 148, *cert. denied,* 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969), and *Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 90 (3d Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)); *see also Brun–Jacobo v. Pan Am. World Airways, Inc.*, 847 F.2d 242, 244 (5th Cir.1988) ("broader" scrutiny). When a judge denies a new trial, "[t]wo factors unite to favor very restricted review[:] ... the deference due the trial judge, who has had the opportunity to observe the witnesses ... [and] the deference properly given to the jury's determination," a factor "further weighted by the constitutional allocation to the jury of questions of fact." *Taylor*, 133 U.S. App.D.C. at 113, 409 F.2d at 148. But when, as in this case, a judge grants a new trial because of excessive verdict, these "two factors oppose each other," *id.*, and thus the reviewing court must be especially careful not to accord undue deference to the trial court's perception of the evidence, given the jury's constitutional responsibility to find facts under proper instructions.

I agree with the majority, *ante* at 596, that we are obliged to follow the *Taylor* formula for resolving the judge/jury conflict here: in reviewing for abuse of discretion, "we will reverse the grant of a new trial for excessive verdict only where the question of damages found by the jury was *clearly* within 'the maximum limit of a reasonable range.'" *Taylor*, 133 U.S.App. D.C. at 114, 409 F.2d at 149 (citation omitted) (emphasis in original); *see Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 594 (D.C.1985) (citing *Taylor* and *Lind* and noting that "[c]lose scrutiny of the trial court's grant of a new trial by the appellate court is required in order to protect the litigant's right to a jury trial"). I therefore turn to this broad inquiry under *Taylor*.

In the first place, as elaborated above in Part I., the trial court's instructions permitted the jury to award compensatory

changes for at least a 7½ hour period. More specifically, the trial court instructed the jury that it "must make an award [of damages] for *any* pain and suffering by the deceased, Mr. Harry Barman, between the time of injury and the date of his death" based on the evidence and consistent with the court's instructions. Neither the trial court nor counsel told the jury that damages for pain and suffering before 3:45 p.m. had been waived. Thus, based on the evidence, the jury properly could have defined the "time of injury" as beginning at 10:30 a.m. and awarded compensatory damages for the 7½ hour period between 10:30 a.m. and 6:05 p.m.

It is important, next, to note that the trial court twice cautioned the jury against action based on prejudice: "You should determine the facts without prejudice, fear or favor, solely from fair consideration of all the evidence. * * * You must weigh[ ] and consider the case without regard to sympathy, prejudice or passion, for or against either party to the action." The court also stressed that the jury must not award "the father, Mr. Barman, any sum for the sorrow, mental distress or grief that he may have suffered by reason of the death of the deceased, his son, Mr. Harry Barman." Based on these and other instructions, therefore, the jury presumptively awarded damages based on the evidence, not on prejudice or sympathy, since the jury is presumed to follow the court's instructions. *See Jones v. Miller*, 290 A.2d 587, 590 (D.C.1972).

The trial court's order does not cite any record basis for concluding that the jury was prejudiced. The court simply generalizes: "given the squalid conditions described to the jury, it is perfectly clear that by its verdict it intended to 'send a message,' and a punitive message at that, telling the District of Columbia government that its citizens would not tolerate maintenance of such abominable conditions for its citizens, even those charged with violations of the criminal law." Kessler, J., Order at 10–11 (May 19, 1988). The trial court's only finding to support this perception of the jury's punitive mentality was a footnote that "[t]he jury's shock and disgust were palpable as it heard testimony about frequent masturbation, nudity, sodomy, failure to clean up human wastes, and other bizarre behavior. While that may be standard fare on the psychiatric ward of any jail in America, it was obviously troubling testimony for the jury sitting in this case." *Id.* at 9 n. 3. Obviously, the trial court had the opportunity "to consider the evidence in the context of a living trial rather than upon a cold record." *Taylor*, 133 U.S.App.D.C. at 113, 409 F.2d at 148. But I do not understand why, in light of the instructions (which the jury is presumed to follow), the jury's "shock and disgust" should not be seen as an appropriate community reaction translated into substantial, though suitable, compensatory damages for the victim's pain and suffering from assaultive conduct proximately caused by the District's manifest official neglect over a long period of time.

Apparently the trial court used juror body language, to some extent, to conclude the verdict must have been excessive. I am troubled about equating juror winces with a violation of the oath to follow the trial court's instructions. In any event, the central reason for the new trial ruling would appear to be the trial court's limitation of compensable pain and suffering to the last 2¼ hours of Barman's life, coupled with the court's references to what it believed were irrelevant incidents of "frequent masturbation, nudity, sodomy, failure to clean up human wastes, and other bizarre behavior." I believe, accordingly, that the trial court found the verdict punitive, and thus excessive, primarily because the jury considered evidence of pain and suffering from morning incidents such as the sodomy and the chemical spraying—evidence which eight of nine judges hold today the trial court erroneously rejected in granting judgment notwithstanding the verdict. If I am correct in assessing what the trial court did, then that court erroneously ascribed a punitive purpose to jurors who had properly been instructed to compensate the plaintiff for damages attributable to that earlier, as well as the later, period. The evidence and the jury instruc-

tions clearly covered the sodomy and Deep Gloss incidents; Mr. Miller testified that correctional officers violate the required standard of care if they are casual observers, not intervenors, when such cruel inmate behavior occurs; and the majority of this court agrees, *see ante* at 595, that the evidence of the sexual and chemical assaults justified compensable injury, not a contrary judgment n.o.v. Finally, the jurors were not invited to award punitive damages. Based on the evidence and instructions, I see no demonstrable basis for the trial court's perception that they did.

The words of the United States Court of Appeals for the Ninth Circuit, overturning a trial court order for a new trial based on perceived jury emotion and sympathy, are applicable by analogy here:

> [C]ertainly a jury presented with a case like this one, involving horrible burn injuries to a child, will be likely to feel great sympathy. The question, however, is whether the jury was able to put aside its personal feeling during its deliberations and decide the case as the evidence and the law dictated. There is no evidence that the jury here did otherwise. The district court repeatedly instructed the jury that sympathy could play no role in its deliberations. Moreover, the damages awarded were consistent with the amount the experts estimated would be required to compensate [plaintiffs] for their injuries and treatment. Punitive damages were denied. In light of the conflicting evidence, the verdict for [plaintiff] does not necessarily indicate that the jury's decision was born of sympathy.

*Roy v. Volkswagen of America, Inc.,* 896 F.2d 1174, 1178–79 (9th Cir.1990) (upholding $3 million award to family for compensatory damages in products liability case

after van overturned, caught fire, and badly burned child).

In sum, in this case, the jury could find that beginning as early as 10:30 a.m., Barman suffered from a sexual assault and an attack with a toxic chemical spray, either of which may have caused the bronchospasm that led to his eventual death as long as 7½ hours later. Given our required close scrutiny with due deference to the jury's, as well as the trial court's, view of the evidence, I believe the jury's $1,000,000 verdict for pain and suffering during that period under the Survival Act claim, see *supra* note 2, must stand because it "was *clearly* within 'the maximum limit of a reasonable range.'" *Taylor,* 133 U.S.App. D.C. at 114, 409 F.2d at 149.[4] I see nothing in the majority opinion that would reject this conclusion under the *Taylor* test *if*—as the record makes clear—plaintiff did not in closing argument waive damages as to the sexual and chemical assaults.

### IV.

This court accordingly should reverse the judgment n.o.v. and the order for a new trial; on this record, we should reinstate the verdict. *See Jones,* 290 A.2d at 589 (where trial court ordered new trial because jury verdict awarding damages for pain and suffering was unwarranted by evidence, this court ordered reinstatement of verdict because evidence demonstrated "physical injury sufficient to support an inference that appellant experienced pain and suffering as a consequence of appellee's negligence").

\* \* \* \* \* \*

In the majority's postscript responding to this dissent, Judge FARRELL acknowledges that plaintiff's counsel, in closing argument to the jury, mentioned that the "asserted acts of sodomy and chemical

---

4. *See, e.g., Capitol Hill Hospital v. Jones,* 532 A.2d 89 (D.C.1987) (sustained $100,000 verdict as not excessive under District of Columbia Survival Act for 45 minutes of conscious pain and suffering caused by hospital personnel turning off oxygen supply); *Ingram v. Howard–Needles–Tammen,* 234 Kan. 289, 672 P.2d 1083 (1983) (sustained, against claim of jury passion or prejudice, verdict of $350,000 for one to two min-

utes of conscious pain and suffering by deceased driver consumed by fire in cab of truck); *Levinge Corp. v. Ledezma,* 752 S.W.2d 641 (Tex. App.1988) (sustained $650,000 jury verdict for 40 minutes of pain and suffering and mental anguish incurred by young man before death from skull fracture after fall from flatbed truck).

spraying" were "possible causes of Barman's suffering." *Ante* at 600 n. 15. Thus, every member of the court agrees that the jury heard, in closing, at least some argument on the sexual and chemical assaults in addition to substantial argument on Barman's death throes in his cell. See *ante* at 600 n. 15; *supra* at 603. For this reason alone I do not understand how the majority can conclude that plaintiff's counsel, in closing argument, withdrew the morning assaults from jury consideration.

In any event, the majority analysis is flawed for another reason. The majority does not hold, as a matter of *law*, that damages for pain and suffering are not awardable for the period of the sodomy and chemical spraying. Rather, the majority concludes, as a matter of *deference*, that it will sustain the trial court's limitation of such damages to the last 2¼ hours of Barman's life. That presents the question: why did the trial court limit damages to "what happened to Mr. Barman between the hours of 3:45 p.m. and 6:05 p.m."? Answer: it did so because, in the court's view of the trial record, that was the only possible period of compensable pain and suffering.[5] Nowhere in its post-trial ruling did the trial court refer to plaintiff's counsel's failure to mention the sexual and chemical incidents in closing argument. My colleagues in the majority, however, repudiate the trial court's evidentiary premise. While purporting to defer to "the trial judge's unique vantage point," *ante* at 600, they correctly reject the judge's view of the record by reversing the grant of a judgment n.o.v. Unlike the trial court, the majority properly finds evidence in this record justifying compensation for pain and suffering for the sexual and chemical assaults. See *ante* at 595; *supra* at 605 n. 1. Rather than resting on deference to the trial court's *reasoning* underlying the

granting of a new trial, therefore, the majority relies on deference to the trial court's *result* while substituting an altogether new principle of its own to carve down the computable period of damages to 2¼ hours: imputed waiver by trial counsel during closing argument.

I could understand (although I would dissent from) a majority holding in a straightforward manner, as a matter of fiat, that $1,000,000 is simply too large a recovery for pain and suffering of the kind Barman endured over a 7½ hour period. But the majority is unwilling to be that direct. Purporting, instead, to defer to the trial court, the majority sustains a result not by agreeing with the trial court's view of the evidence but by announcing a new rule of law which the trial court never considered (nor was asked to consider). I believe this is mischievous. *Cf. District of Columbia v. Bethel,* 567 A.2d 1331, 1334 (D.C.1990) (in sustaining $1,000,000 judgment upon a verdict for prisoner injured at Lorton, court declined "to venture outside the trial record and consider facts *and contentions* never presented to the trial judge") (emphasis added).

## APPENDIX

*Court Documents*

1. Complaint; Amended Complaint—

Plaintiff's original complaint, filed January 17, 1986, charged that the District of Columbia wilfully or negligently left toxic cleaning fluid unsecured in the shower area, that Barman ingested or was force-fed the poisonous fluid, and that "after many hours of pain and agony, [Barman] died while kneeling in prayer." [Original Complaint at 6.] Plaintiff did not allege sodomy, because that was not known until after Stroman's deposition, taken for pur-

---

5. The trial court had granted judgment notwithstanding the verdict for failure of proof on standard of care and proximate cause. For purposes of granting a new trial in the alternative, the trial court necessarily had to assume/find possible liability and damages on this record. The trial court concluded that liability and damages for pain and suffering could be justified, if at all, only for the 2¼ hour period between 3:45 p.m. and 6:05 p.m. The trial court, therefore, apparently assumed the jury must have limited its $1,000,000 damage award to that period as well—a fallacious assumption in light of the majority's ruling that liability and damages would have been awardable for the entire 7½ hour period but for counsel's closing argument.

poses of another, related case [*see* District of Columbia brief at 6] on November 7, 1986. [Tr. 164–165] Plaintiff then filed an amended complaint, not in the record, which the parties agree alleges forceful sodomy.

### 2. Pretrial Statement—

In the pretrial statement, plaintiff alleged that Barman was sodomized and later found unconscious on the day of his death. [R. 49] Plaintiff claimed compensatory damages of $1.5 million from assault, negligence, and extreme emotional distress. [R. 50]

### 3. Pretrial Order—

The court's pretrial order recites that plaintiff contends Barman was sexually assaulted and provided inadequate care. [R. 118] As settlement, plaintiff demanded $900,000. [R. 122]

### 4. Trial Brief—

In a trial brief, plaintiff alleged that Barman had been assaulted and sodomized by three inmates in full view of correctional officers [Trial Brief at 5] and that decedent had died of trauma after the gang rape and the poisoning from being force-fed Johnson's Deep Gloss. [*Id.* at 8] Claimed damages included pain and suffering. [*Id.* at 9]

### 5. Post-trial Memorandum—

In Plaintiff's Memorandum of Points and Authorities in Opposition to Motion for New Trial, plaintiff-appellant argued that "[v]iewing the evidence in the light most favorable to plaintiff, on January 28, he was then sodomized, sprayed with Deep Gloss, and suffered extreme agony in a jail cell rapidly becoming smeared with his own excrement during his struggle." [R. 185]

*Opening Statement by Plaintiff's Counsel*

[Y]ou will hear evidence that in the early morning hours while [Barman] was incarcerated in South 3, he was sexually attacked by other residents who are not identified of the D.C. Jail. [Tr. 17]

\* \* \* \* \* \*

You will also find evidence that he was sprayed with some sort of an industrial cleaner probably deep gloss material made by Johnson's which should not have been available to the people who sprayed him. [Tr. 17]

\* \* \* \* \* \*

And it will be shown to you that [the bronchospasm] could have had its origin in the traumatic experience of the sodomization, or in the spraying with the deep gloss because there will be indications in the lung tissue that show that this man had ingested some of that. [Tr. 20–21]

\* \* \* \* \* \*

And the final two counts are for what is called the infliction of emotional distress both intentional and negligent infliction. And that is that Harry Barman was subjected to severe emotional distress, that is to say the assault, the spraying, the dying and this was inflicted either intentionally depending on how you read the evidence ... or negligently, that is to say by their breaching a duty of care. [Tr. 24]

*Evidence at Trial*

### 1. Spraying Incident—

Physician Assistant Raymond Stroman, a defendant, testified: "I came on the unit about 10:30 in the morning. As most ... of the officers say I'm very sticky about who is out and I observed the white fellow and three black dudes down in the shower. I asked the officer what the hell is the white ... boy doing down there? He said, he is on detail. Excuse me. I s[aid] bullshit because he hasn't been cleared and refused treatment [medication]." [Tr. 155; *see* Tr. 156]

Officer Joyce Webb read from her Incident Report that after 6 p.m. resident Tyrone Lucky stated that Barman "had snuffed some stainless steel cleanser which is used to clean with on the unit. Resident Lucky also stated that resident Harry Barman ... told him that he did not feel

good." [Tr. 105] Officer Webb then testified that the cleaner was regularly locked in a utility closet, was given to residents only for cleaning detail, and would not have been available to Barman unless he was on cleaning duty. [*Id.*]

According to resident Lucky, "In the shower there was two dudes cleaning the shower, and I just seen another resident spray the can—spray the can in his face. And so he got out of the shower, he came upstairs and told me he felt tired and was going to his room and lay down." [Tr. 110]

2. Sexual Encounter—

Stroman testified that beginning at 10:30 a.m. he had observed three men "dry fucking . . . rubbing up against" Barman in the shower over a period of at least 15 to 20 minutes. [Tr. 155–58] Plaintiff's counsel read from Stroman's deposition, claiming surprise when Stroman did not testify, as he had on deposition, that Barman had been sodomized forcefully. [Tr. 164–165] Stroman then acknowledged he had told inmates "on the unit" that they had "screwed the white boy to death." [Tr. 165] He also acknowledged, in referring to a conversation with his "superiors," that he had characterized the activity as "screwing." [Tr. 166] He added that he had testified truthfully at his deposition. [Tr. 185–186]

3. Standard of Care—

Plaintiff's expert penologist was E. Eugene Miller, whose career included twenty-two years in prison operations and supervision, authorship of a book on jail management, familiarity with the D.C. Jail from working for the D.C. Department of Corrections for five years, and active membership in the American Correctional Association, American Jail Association (board member), and National Sheriff's Association. [R. 292–298] During his testimony on the standard of care for mentally disabled inmates, Mr. Miller referred to the standards for adult local detention facilities promulgated by the American Correctional Association in cooperation with the Commission on Accreditation for Corrections. [Tr. 303–304]

Mr. Miller testified that correctional officers should observe normal inmates at irregular thirty minute intervals, with more frequent observations for mentally disturbed inmates. [Tr. 304] These officers should prepare and keep complete shift reports of all emergency or unusual incidents, including kneeling in a cell nude for over 2½ hours. [Tr. 309, 310, 315] If a correctional officer observes a sodomization—voluntary or involuntary—he or she should immediately intervene or call for appropriate back-up if the officer's safety would be jeopardized by intervention. [Tr. 318–319] According to Mr. Miller, there would be a violation of a standard of reasonable care for an officer not to intervene by verbally calling to an inmate "who is not moving on a cold concrete floor in the nude who doesn't move for several hours" [Tr. 341] and when an observable amount of fecal matter is visible on the cell floor. [Tr. 360] Mr. Miller noted that the facts in this case raise the question whether the correctional officers were, in fact, making their rounds as required. [Tr. 364]

4. Causes of Pain, Suffering, and Death—

Dr. John Smialek, Chief Medical Examiner for the State of Maryland, testified he had arrived at an opinion to a reasonable medical certainty that Mr. Barman "had died of an acute attack of bronchospasm." [Tr. 550]

\* \* \* \* \* \*

Dr. Smialek also testified: "Mr. Barman had been suffering from a process that was not sudden, not within say minutes but something that had been going on for a period of hours at least two or three hours." [Tr. 555] "[He] was becoming increasingly distressed to the point that the [e]ffect that shortage of breath was having on his system was being reflected by him having nausea, vomiting, the severe diarrhea." [Tr. 556–557] "[T]he administration of oxygen and adrenalin would in all likelihood have been sufficient to reverse that particular episode and prevent his

death." [Tr. 558] Furthermore, according to Dr. Smialek:

It is my conclusion that I could not state precisely what Mr. Barman's attack was precipitated by because attacks of this type can occur spontaneously with no identifiable agent triggering them. But they typically can be precipitated by emotional stress and can be precipitated by some offending agent in the environment. . . . It is my opinion that this substance [Deep Gloss] could possibly have been one of or the factor that led to the gradual onset of the symptoms that were part of the attack of bronchospasm. [Tr. 559]

\*   \*   \*   \*   \*   \*

And certainly, as I mentioned before that emotional stress can trigger this type of attack. It is certainly possible that a sexual attack would be sufficient to precipitate this particular type of acute episode. [Tr. 564]

*Discussion of Jury Instructions by Court and Counsel*

As to pain and suffering, the trial court said:

The Binker case . . . indicates that the jury has a lot of latitude on referring that there was pain. Well, both pain and suffering. And, what is more, there is certainly enough testimony in this record from Dr. Smilac [Smialek] to indicate that on his theory at least, if the jury accepts it, that Mr. Barman went through a great deal of pain and suffering before he died. [Tr. 984–85.]

*Jury Instructions*

As to damages, the court instructed:

If you find for the plaintiff, then you shall award to the plaintiff a sum of money which will fairly and reasonably compensate for all the damage suffered which was caused by the defendant. [Tr. 1018–19]

\*   \*   \*   \*   \*   \*

You may consider the extent and duration of any bodily injury which was sustained. You may consider the effect that such injuries had on the overall physical and mental health and wellbeing of the plaintiff. You may consider any physical pain and mental anguish that the plaintiff did suffer. You may consider any inconvenience or discomfort that the plaintiff suffered, and you may consider any loss of earnings that the plaintiff suffered. [Tr. 1020]

\*   \*   \*   \*   \*   \*

If you find for the plaintiff on liability, you must make an award for any pain and suffering suffered by the deceased, Mr. Harry Barman, between the time of injury and the date of his death, and the pecuniary loss suffered by the deceased, Mr. Barman, as a result of the injuries sustained in this case. Your award should include reasonable compensation for any bodily injury, disability, mental anguish, disfigurement and/or deformity, and inconvenience and discomfort suffered by the deceased between the time of the injury to the time of his death. [Tr. 1024]

As to prejudice and speculation, the court instructed:

You should determine the facts without prejudice, fear or favor, solely from a fair consideration of all the evidence. [Tr. 1004]

\*   \*   \*   \*   \*   \*

You must weigh[ ] and consider the case without regard to sympathy, prejudice or passion, for or against either party to the action. [Tr. 1006]

\*   \*   \*   \*   \*   \*

You are not to award to the plaintiff speculative damages; that is, compensation for present or future loss which although possible is remote or guesswork. You are to base your verdict not on guesswork or speculation, but only upon evidence which shows by a preponderance that there is a reasonable probability of future losses. [Tr. 1019]

\*   \*   \*   \*   \*   \*

[Y]ou must not award that beneficiary, the father, Mr. Barman, any sum for sorrow, mental distress or grief that he

may have suffered by reason of the death of the deceased, his son, Mr. Harry Barman. [Tr. 1022]

*Closing Argument to the Jury*

In closing argument, plaintiff's counsel said:

[S]omething happened to Harry Barman in the morning or early afternoon hours of January 28th, when he was incarcerated at South 3, the mental health unit, the maximum care type facility in the District Jail. Something happened to him. He either got gang raped, sodomized either voluntarily or involuntarily, if you believe Mr. Stroman one way or the other.

He was sprayed with some deep gloss, or he may have suffered some other sort of trauma, something perhaps that arose out of his condition. But, something happened to the man.

At around 3 o'clock, he was locked down in his cell, Cell 29 at the D.C. Jail, where between 3 o'clock and 6:05 p.m., he went through a lot of distress. He must have traveled around the cell several times, and there came a point when he died, and he died of one or two things, perhaps, depending on who[m] you believe. But, he died in such a way that he did not die quickly.

He must have flopped around for twenty minutes or a half hour at a minimum, no matter who you believe, based on the physical evidence. And then he died and he stayed in this kneeling position for some period of time until finally he was discovered at 6:05 p.m. by the correctional officers who were there to take care of him. [Tr. 1026–27]

\*    \*    \*    \*    \*    \*

The importance is, they had—had they intervened, had they been doing what they were supposed to do during the time Mr. Barman was dying, they could have intervened. [Tr. 1033]

\*    \*    \*    \*    \*    \*

If you will recall, Dr. Smilac [Smialek], who is the chief medical examiner of Baltimore, and a very experienced person, testified. He testified in a clear and uncontradicted, unshaken by cross examination, in a clear, uncontradicted manner, that Mr. Barman, through his observations of the scene and, importantly, the slides which he had reflected on, had died of an acute bronchospasm.

And what is this acute bronchospasm? It is an onset—an acute onset of this underlying condition, albeit unreported, of asthma that Mr. Barman suffered from. And, that it was triggered by one of the causes I suggested to you earlier. [Tr. 1034]

\*    \*    \*    \*    \*    \*

But, you must assess the impact on Mr. Barman and the extreme distress and discomfort that was caused by his thrashing around for a period of time in that cell while these people were supposed to be taking care of him.

And, I would submit to you that there is a significant compensation due Mr. Barman's estate because of this pain and suffering suffered by Mr. Barman during his death struggle at the D.C. Jail. [Tr. 1045]

The government lawyer, in closing argument, said:

If the District of Columbia did anything—anything at all, or failed to do something that killed Mr. Barman, the District, like anybody else, must pay. That's the law. That's the law. [Tr. 1051]

\*    \*    \*    \*    \*    \*

Well, it's up to you. If you believe that the District did something wrong to Mr. Barman, if you believe that Mr. Barman thrashed around his cell for forty-five minutes to an hour before he died, if you believe that these correctional officers were negligent in letting Mr. Barman die, then you should find for the plaintiff, and you should award them a sum of money that would adequately compensate for the loss of Mr. Barman. [Tr. 1055]

WAGNER, Associate Judge, concurring in part and dissenting in part:

I concur in the result reached by the majority affirming the order of the trial court for a new trial; however, I cannot join in all of its reasons for doing so. I dissent from that portion of the decision which holds that the jury summation made by appellant's counsel provides support for its decision. On the contrary, I agree with the dissenting opinion of Judge Ferren that such a rationale for rejecting the jury's verdict is improper and legally unsupportable. However, unlike my dissenting colleagues, I conclude that there is firm support in the record for sustaining the trial court's grant of a new trial on all claims except the claim for intentional infliction of emotional distress under the Wrongful Death Act, D.C.Code § 16–2701 (1989). As to that claim, contrary to the positions of all of my colleagues, I conclude that the trial court's grant of judgment notwithstanding the verdict should be affirmed. For these reasons, I am compelled to state separately the reasons for my dissent from portions of the majority opinion and my rationale for joining in the majority's affirmance of the order for a new trial on all except one claim and for concluding that judgment notwithstanding the verdict should be affirmed on the claim for negligent infliction of emotional distress under the Wrongful Death Act.

## I.

My primary disagreement with the majority opinion is its reliance upon the closing argument of appellant's counsel in divining the jury's focus in measuring damages and in testing the trial court's finding of excessive verdict against the elements of damages thus pinpointed. This method of analysis, in my view, is inconsistent with basic principles which determine the issues to be resolved by the jury. The civil trial is

governed by well established procedures which narrow the issues for the jury's consideration.[1] Unless the issues raised by the pleadings have been withdrawn by the parties or eliminated through such mechanisms, a plaintiff is entitled to have all theories of recovery and all elements of damages considered by the jury. *McDaniel v. Cusimano*, 148 A.2d 303, 305 (D.C. 1959); *Metropolitan Railroad v. Moore*, 121 U.S. 558, 568, 7 S.Ct. 1334, 1339, 30 L.Ed. 1022 (1887). To that end, the court instructs the jury on the law of the case and the theories of the parties. *Reese v. Wells*, 73 A.2d 899, 902 (D.C.1950). Unless the contrary appears, jurors are presumed to follow and understand the instructions of the court. *German v. United States*, 525 A.2d 596, 609 (D.C.1987); *Burkley v. United States*, 373 A.2d 878, 881 (D.C. 1977). Absent an instruction to do otherwise, it is assumed that the jury will regard all evidence and elements of damages as proper for consideration, rather than the contrary. *Hayes v. Sutton*, 190 A.2d 655, 656 (D.C.1963). Thus, where one item of damages submitted in evidence is improper for consideration (*e.g.*, where proof is insufficient to establish a causal connection between the negligent act and damages claimed), it is error not to so instruct the jury. *Id.* These principles dictate against any assumption that the jury overlooked an element of damages simply because omitted or not emphasized in closing argument, which is not evidence. *See Harmatz v. Zenith Radio Corporation*, 265 A.2d 291, 292 (D.C.1970).[2]

Although the court has the power to direct a verdict at the conclusion of counsel's opening statement, we have cautioned that the power must be exercised sparingly. *Cook v. Safeway Stores, Inc.*, 354 A.2d 507, 508 (D.C.1976). For obvious reasons, we have never held that omissions from closing argument of essential elements of a

1. *See, e.g.,* Super.Ct.Civ.R. 12(b)(6) (failure to state claim upon which relief can be granted) Super.Ct.Civ.R. 56(d) (partial summary judgment); Super.Ct.Civ.R. 16(c)(1) & (e)(2) (pretrial procedure for simplification or elimination of frivolous claims or defenses and pretrial order which controls action absent modification);

*see also Gabrou v. May Department Stores Co.,* 462 A.2d 1102, 1104 (D.C.1983) (directed verdict for issues on which no reasonable juror can find for non-moving party).

2. *See also* Standardized Civil Jury Instructions for the District of Columbia, No. 2–5 (1985).

claim may constitute a basis for the conclusion that the claim is no longer pursued. While the focus of closing argument may provide insight into the attorney's view of the case, it provides no clue as to which of several injuries or damages the jury found proven in rendering a general verdict. Although we can reasonably infer from experience the adverse influence of improper arguments upon a jury, we have no way of fathoming whether the absence of argument on an issue resulted in the jury's failure to decide it or to give it consideration. Even the fairness of an argument cannot be determined, except in extreme cases, without viewing it in light of the evidence and other trial proceedings. *Haigler v. Logan Motor Co.*, 86 A.2d 108, 109 (D.C.1952). So too, except where some improper element is injected which may infect the jury's decision, the elements of damages comprising its verdict must be judged with reference to the evidence and the court's instructions.

A new trial for excessive verdict will be reversed only when the amount of damages awarded by the jury clearly exceeds the maximum limit of a reasonable range within which the jury could operate. *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 594 (D.C.1985) (quoting *Taylor v. Washington Terminal Co.*, 133 U.S.App. D.C. 110, 114, 409 F.2d 145, 149, *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969)). In determining whether this standard is met, we must examine the extent and nature of the damages proved by the evidence. *See Weinberg v. Johnson*, 518 A.2d 985, 994 (D.C.1986); *Taylor v. Washington, supra*. This evaluation cannot be accomplished by reference to closing argument. For all of the foregoing reasons, I cannot agree with the majority that the closing argument of counsel can be utilized, by the trial court or by this court in review, to ascertain that the jury considered certain elements of damages and disregarded others in making its composite award.

## II.

In determining whether the trial court abused its discretion in concluding that the verdict was outside the maximum limit of a reasonable range, the inquiry must be focused on whether there is firm evidentiary support in the record for the trial court's finding. *Weinberg v. Johnson, supra*, 518 A.2d at 994. There is such firm support in the record of this case. On certain claims, however, multiple theories of liability were presented, some permissible and some impermissible. As to such claims, a new trial can be granted for that reason alone. *District of Columbia v. White*, 442 A.2d 159, 165 (D.C.1982).

The jury considered and returned separate verdicts on independent claims for damages based on negligence and negligent infliction of emotional distress. Appellant pursued each of the causes of action under both the Wrongful Death Act, D.C.Code § 16–2701 et seq. (1989) and the Survival Act, D.C.Code § 12–101 et seq. (1989). In reviewing the trial court's grant of a judgment notwithstanding the verdict, each claim and the evidence which supports it must be examined separately to determine whether, viewing the evidence in the light most favorable to appellant, no reasonable juror could have reached a verdict in appellant's favor on the particular cause for which a verdict was returned. *See Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100, 1103 (D.C.1986).

Our review is somewhat complicated by the fact that appellant advanced more than one theory of liability for each of the four causes of action for which a verdict was rendered, and written interrogatories were not submitted to the jury for special findings on which theory or theories the jury found appellee liable.[3] Similarly, special findings were not made on which injuries

---

3. *See* Super.Ct.Civ.R. 49(b); *Flynn v. Staples*, 34 App.D.C. 92, 97 (1909) (special issues may be submitted to the jury to determine which negligent acts form basis for verdict); *Nesmith v. Alford*, 318 F.2d 110, 125 n. 30 (5th Cir.1963) (special interrogatories urged for complicated issues, multiple and subsidiary); *see also Allen v. Uni–First Corp.*, 151 Vt. 229, 232, 558 A.2d 961, 963 (1989) (special interrogatories encouraged for multiple, overlapping theories of liability).

or damages were found to have been proximately caused by appellant's negligent acts or omissions. Nevertheless, it can be determined from the record that certain theories of negligence were not established by the evidence and that the evidence did not show that injury or extensive damages resulted from all negligent acts or omissions which were proved.

### A. *Wrongful Death Act Claims*

Appellant is not entitled to an award of damages under the Wrongful Death Act on any theory for negligent infliction of emotional distress. Under the Wrongful Death Act, the wrongful act upon which liability is premised must result in death before recovery may be had. D.C.Code § 16–2701 (1989). The record is devoid of any proof that emotional distress caused decedent's death.

Claims under the Wrongful Death Act are intended to compensate decedent's close relatives for losses sustained by them where decedent's death results from the wrongful act of another. *Semler v. Psychiatric Institute of Washington, D.C.,* 188 U.S.App.D.C. 41, 43–44, 575 F.2d 922, 924–25 (1978); *Runyon v. District of Columbia,* 150 U.S.App.D.C. 228, 230, 463 F.2d 1319, 1321 (1972). Damages in such actions are measured from date of decedent's death. *Doe v. Binker,* 492 A.2d 857, 864 (D.C.1985). The tort of negligent infliction of emotional distress allows a plaintiff to recover for emotional distress, mental disturbance or its consequences where negligently caused by conduct which the tortfeasor knew or should have realized involved an unreasonable risk of causing such harm. *Asuncion v. Columbia Hosp. for Women,* 514 A.2d 1187, 1188–89 (D.C. 1986); *Bass v. Nooney Company,* 646 S.W.2d 765, 772–73 (Mo.1983) (en banc). Under the modern rule, to be actionable, the emotional distress must be serious and foreseeable, i.e., " 'medically diagnosable' and 'medically significant'." *Asuncion,*

*supra,* 514 A.2d at 1189 (citing *Bass, supra,* 646 S.W.2d at 772–73).

An action for negligent infliction of emotional distress is personal to the injured party. While cognizable under the Survival Statute,[4] which preserves for the estate rights of action a decedent would have had if he lived,[5] it is doubtful that such an action is ever viable under the Wrongful Death Act. Appellant failed to offer proof to a reasonable degree of medical certainty that emotional distress was a proximate cause of decedent's death. *See Psychiatric Institute of Washington v. Allen,* 509 A.2d 619, 624 (D.C.1986). Where there is no proof that decedent's death was caused by infliction of emotional distress or mental disturbance, no action will lie under the Wrongful Death Act for the tort. Therefore, the trial court did not err in granting judgment notwithstanding the verdict on the wrongful death claim based on negligent infliction of emotional distress. Appellee is entitled to judgment notwithstanding the adverse verdict against it on this claim. *See Oxendine, supra,* 506 A.2d at 1103; *District of Columbia v. Gandy,* 450 A.2d 896, 900 (D.C.1982).

Appellant offered evidence in support of only one of the possible theories of negligence which resulted in death thereby warranting recovery under the Wrongful Death Act. In my view, liability for negligence causing death can be premised only upon the failure of the correctional officers to observe Mr. Barman's condition from 3:05 p.m. until 6:05 p.m.[6] and to provide him with medical treatment necessary to save his life. As to this theory of liability, appellant established the applicable standard of care, appellee's deviation from that standard and a causal relationship between appellee's negligence and Barman's death. *See Washington v. Washington Hosp. Center,* 579 A.2d 177, 181 (D.C.1990).

The remaining claims of negligence, which appellant contends resulted in a sex-

---

4. D.C.Code § 16–2701.

5. *See Semler, supra,* 188 U.S.App.D.C. at 44, 575 F.2d at 925.

6. The evidence showed that death occurred from one to two hours before discovery of the body. Therefore, evidence of appellee's omissions must be considered between 3:05 p.m. and about 5:05 p.m.

ual attack on Mr. Barman and his exposure to a chemical, were not shown to be the cause of decedent's death. Therefore, any negligent acts or omissions which resulted in these earlier incidents provide no basis for recovery under the Wrongful Death Act. *See* D.C.Code § 16–2701. As the majority points out, appellant's expert failed to offer an opinion based upon a reasonable degree of medical certainty that decedent's death, more likely than not, proximately resulted from a "sexual attack" or chemical exposure. Testimony based upon the mere possibility of a causal relationship between the negligent act and the injury (or death) is insufficient for the imposition of liability. *Baltimore v. B.F. Goodrich Co.*, 545 A.2d 1228, 1232 n. 6 (D.C.1988) (citing *Psychiatric Institute of Washington v. Allen*, 509 A.2d 619, 624 (D.C.1986)). The expert's testimony with respect to any causal relationship between these earlier incidents and decedent's death did not rise above the level of a mere possibility of a connection between the events and decedent's death. Therefore, the evidence was insufficient to establish proximate cause. Absent proof of this nexus, the theories of negligence which purportedly resulted in a sexual attack and chemical exposure should not have been submitted to the jury for consideration under the Wrongful Death Act.

We have held that where several theories of liability have been submitted to the jury, one permissible and the other impermissible, and it cannot be determined upon which theory the jury relied in reaching a favorable verdict for appellant, the case must be remanded for a new trial. *District of Columbia v. White, supra*, 442 A.2d at 165. Since any earlier acts of negligence (prior to the failure to provide medical care between 3:05 p.m. and time of death) did not cause death, these theories of recovery were improper for consideration in conjunction with the one viable theory of recovery. Although the jury's verdict could be based properly on one of the three theories of negligence, we cannot deter-

mine upon which theory the jury actually based its verdict; therefore, under *White*, a new trial is warranted.[7] *Id.*

### B. *Survival Act Claims*

The jury reserved the major portion of its damage awards for appellant's claims for negligence and negligent infliction of emotional distress under the Survival Act: $30,000 for negligence and $1,000,000 for negligent infliction of emotional distress. Under this Act, the rights of action which decedent would have had if he had lived are preserved. *Semler, supra*, 188 U.S.App. D.C. at 44, 575 F.2d at 925. Recovery is restricted to what decedent would have recovered for the tort had death not intervened. *Id.; Graves v. United States*, 517 F.Supp. 95, 99 (D.D.C.1981) (citing *Semler, supra*). Although future lost earnings are recoverable under the Survival Act, such future losses are implicated only as to the negligent conduct giving rise to the claim which resulted in death. *See Semler, supra*, 188 U.S.App.D.C. at 43, 575 F.2d at 924. Any tort actions preserved under the Survival Act which do not result in death, allow recovery to the extent allowed for such claims where the person survives. To the extent proved by the evidence, a plaintiff may recover all cognizable items of damages (*e.g.*, pecuniary losses, physical pain, discomfort, inconvenience, humiliation, embarrassment) proximately resulting from a defendant's negligent act or omission. *See Wingfield v. Peoples Drug Store, Inc.*, 379 A.2d 685, 688 (D.C.1977).

It is elementary that a plaintiff is entitled to compensation only for those injuries or damages proximately caused by a particular tort. *District of Columbia v. Freeman*, 477 A.2d 713, 715–16 (D.C.1984) (injury or damage must be a direct result or reasonably probable consequence of negligent act or omission to allow recovery); *Boiseau v. Morrissette*, 78 A.2d 777, 780 (D.C.1951). In this case, not every theory of negligence was proved, and every theory advanced would not support fully the total

---

**7.** Appellant states in his brief that he does not seek a new trial on the wrongful death claims for which the jury awarded only nominal dam-

ages. Nevertheless, a review of each claim assists in demonstrating the propriety of the trial court's ruling on the remaining claims.

damages claimed. Therefore, it is necessary to consider any separate injuries and damages traceable to a proven act of negligence in evaluating the trial court's ruling that the verdict was excessive. Again, we are hampered, but not totally restricted in our review, by the absence of special verdict findings for each claim.

### 1. Assault and chemical exposure

Appellee's only negligent acts or omissions which could proximately have resulted in the "sexual assault" were its negligence in allowing decedent in an area where he could be exposed to other inmates and its failure to intercede to prevent continuation of the sexual activity observed by its employee. Similarly, the chemical exposure can be traced only to appellee's failure to keep decedent from an area of danger. In order to recover, a plaintiff must prove the causal connection between the tortfeasor's negligence and all injuries and damages claimed. *Manes v. Dowling*, 375 A.2d 221, 224 (D.C.1977).

It was not shown that pecuniary losses resulted from either incident. Since any injuries traceable to two events did not result in death, future income losses cannot be predicated on these claims. Additionally, appellant's damages for pain, suffering, mental anguish and the like endured by Mr. Barman as a result of the "sexual assault" and chemical exposure, cannot be amassed as part of any suffering he endured as a result of the asthma attack which went untreated. No nexus was shown between these events and decedent's death for the reasons previously stated. Liability for damages will not attach absent a direct

causal link between the breach of duty and the injury. *District of Columbia v. Freeman*, 477 A.2d 713, 716 (D.C.1984). Generally, recovery for injuries of this nature is based upon a showing of the nature, intensity and duration of such injuries. *See, e.g., Garner v. Sam S. Bevard & Sons*, 342 A.2d 52, 54 (D.C.1975). The injuries and elements of damages flowing from each negligent act in this case must be viewed separately because they were not triggered by the same event.[8]

Appellant failed to establish that Mr. Barman was forcibly assaulted or suffered pain, mental distress or emotional anguish as a result of appellee's negligent omission which provided the opportunity for the sexual activities recounted by Raymond Stroman, the only witness to the event who testified at trial. The witness described Mr. Barman's reaction to the graphically detailed acts of mutual masturbation as one of pleasure, not pain. Assuming the sufficiency of the deposition testimony of Stroman to establish that sodomous acts occurred between decedent and other inmates,[9] that testimony provides no clue that the acts were involuntary nor that decedent experienced pain, suffering, mental anguish or distress. No matter how disdainfully one may view such acts, absent evidence that these acts were non-consensual or otherwise resulted in injury, we cannot impute that revulsion to decedent nor speculate that an involuntary sex act, injury, anguish or suffering occurred. On this claim, appellant failed to sustain his burden of establishing the fact of the injury (*i.e.*, a non-consensual sex act) traceable to appellee's negligence.[10]

---

8. Although not mandatory, the use of special interrogatories in such cases not only guides the jury, but also assists with post-verdict review. *See* Super.Ct.Civ.R. 49(b).

9. This conclusion is premised on a statement in the deposition which was used to impeach the witness' testimony. The jury was instructed that prior inconsistent statements could be used to evaluate credibility and not for establishing the truth of any fact contained in the statement. I recognize that where a witness affirms the truth of a prior inconsistent statement, it may be considered not only for impeachment purposes, but also as substantive evidence in the case. *See Watts v. United States*, 362 A.2d 706,

711–12 n. 11 (D.C.1976) (en banc) *United States v. Borelli*, 336 F.2d 376, 391 (2d Cir.1964). However, unequivocal affirmance of the prior statement by the witness is questionable here, given that he acknowledged having tried to tell the truth at deposition and elaborated, explained and denied at trial having seen the sodomous act mentioned in the deposition.

10. I recognize that sexual contact with a person who is incapable of consenting is deemed to be involuntary. However, appellant failed to establish that the nature of any mental illness suffered by Mr. Barman rendered him incapable of consenting to such acts. Presumably, not everyone who suffers a mental illness is incapa-

Here, the only portion of the deposition read at trial does not elucidate the event. The statement by Stroman in the deposition was that he "... told the residents I say yeah. Then they screwed the boy to death when I got back." This excerpt from the deposition cannot provide evidence that the literal consequences described in the obvious hyperbole (*i.e.,* decedent's death) flowed from the sodomous acts. Indeed, the statement does not even recount what the witness saw. The witness only reported what he remarked to others. In acknowledging that he made an effort to testify truthfully at the deposition, the witness at best acknowledged that he did in fact make the statement to other inmates. Moreover, the statement sheds no light on what the witness observed about decedent's reactions to the incident.[11] Therefore, we are left with Stroman's trial testimony that whatever acts he saw were voluntary. To conclude otherwise would require *impermissible speculation.*

There was no evidence that decedent suffered injury as a result of chemical exposure. The incident was not proven to have proximately caused decedent's death nor did it result in observable injury on which to base an independent recovery for the tort. Moreover, any damages recoverable solely because the victim was subjected to this offensive act would not be so substantial as to justify the verdict rendered in this case. After the incident, Mr. Barman indicated that he was tired and did not feel well. We can only speculate about the cause of his fatigue and illness.[12] Even assuming the causal connection between the chemical exposure and decedent's feeling of fatigue and illness, no more than modest damages would be warranted given the extent, nature and duration of the observable, limited reported consequences.

## 2. Negligent failure to provide medical assistance

Any substantial damages to which appellant is entitled necessarily resulted from the remaining theory of liability, appellee's negligent failure to monitor Mr. Barman in his cell and to provide him with medical assistance which would have saved his life. Therefore, I agree with the conclusions of the majority and the trial court that the significant period for measuring decedent's damages resulting from this negligence is from the time he entered his cell at about 3:05 p.m. until his death (which occurred by about 5:05 p.m.). At least as to the claim for negligent infliction of emotional distress under the Survival Act, the award of damages for this brief period, as the majority concludes, was out of proportion to the pain and suffering proven during this critical period. Accordingly, I concur in the result reached by the majority affirming the order granting a new trial because the verdict was excessive.

The separate claims for negligence and negligent infliction of emotional distress under the Survival Act were based on the same theories of liability. I find no need to address separately whether the trial court erred in concluding that the verdict returned on the claim for negligence under the Survival Act was excessive. The issues for both claims are related. Where the issues are not separate and distinct, a retrial on all issues is warranted. *Weinberg v. Johnson, supra,* 518 A.2d at 993; *Lacy v. District of Columbia,* 408 A.2d 985, 990 (D.C.1979). Therefore, a new trial is required.

ble of functioning in all areas. Moreover, appellant proceeded on the theory of forcible sodomy at trial. *See Hackes v. Hackes,* 446 A.2d 396, 398 (D.C.1982) ("Parties may not assert one theory at trial and another on appeal.")

11. Cause of death in this case required expert testimony. Considering that cause of death was a central issue in the case, admission into evidence of Stroman's "lay opinion" expressed through comments he made to others about the cause of decedent's death was highly prejudicial and lacked probative value. Therefore, it should not have been allowed for any purpose other than impeachment. Apparently, the trial court allowed it only for that purpose.

12. There are circumstances where pain and suffering may be inferred from the fact of physical injury without the aid of expert testimony. *Jones v. Miller,* 290 A.2d 587, 591 (D.C.1972). Here there was no obvious physical injury from the chemical exposure.

III.

*Conclusions*

For the reasons stated in Part II. A. of this separate opinion, I conclude that, viewing the evidence in the light most favorable to appellant, no reasonable juror could have found for appellant on the claim for negligent infliction of emotional distress under the Wrongful Death Act. Therefore, I would affirm the trial court's order granting a judgment notwithstanding the verdict as to that claim.[13] *See Oxendine v. Merrell Dow Pharmaceuticals, Inc., supra,* 506 A.2d at 1103. The claim for negligence under the Wrongful Death Act requires a new trial because several theories of liability, including impermissible ones, were submitted to the jury, and the theory on which the verdict was based ultimately cannot be determined. *See District of Columbia v. White, supra,* 442 A.2d at 165. For this reason, I would grant a new trial on the claim. Therefore, I concur in the result reached by the majority in affirming the order for a new trial on the claim. I also join the majority in affirming the trial court's order for a new trial of the claims under the Survival Act for the reasons stated herein.

---

**13.** The affirmance would be based on grounds different from those relied on by the trial court. *See In re O.L.,* 584 A.2d 1230, 1232 n. 6 (D.C. 1990) (a correct decision of the trial court must be affirmed even if reached for the wrong reason).